# IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Gunn Hill Dairy Properties, LLC; Michael J. Cherniske; Aztex Dairy, Inc.; Thomas H. Bell; Margaret H. Bell; Tony Santos; Laura Santos; Joe Viveiros; Robert Viveiros; Tony Cabral; Crossroads Dairy, LLC; Joe Andrade; Gloria Andrade; Milk-King Dairy, LLC; Ron Myers; Jonothan Harker; Hyrum Harker; Merrill Harker; Gardner Family Farm Trust; Kevin Gardner; John M. Silva; Michelle Silva; Alan Conklin; Sue Conklin; John Nye; Daniel Morgan; Danielle Morgan; Tony Stanworth; Conard G. Stanworth and Neree Erickson Stanworth Revocable Family Trust; Kenneth Thatcher; Craig Johnson; and Jacki Johnson, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | OPINION <br><br> Case No. 20090852-CA <br><br> F I L E D <br> (January 20, 2012) <br><br> 2012 UT App 20 |
|     Plaintiffs, Appellants, and Cross-appellees, | ) ) ) | |
| v. | ) ) | |
| Los Angeles Department of Water & Power, Intermountain Power Agency, Intermountain Power Services Corporation, and Southern California Public Power Authority, | ) ) ) ) ) ) | |
|     Defendants, Appellees, and Cross-appellants. | ) | |

-----

Fourth District, Fillmore Department, 050700157
The Honorable Donald J. Eyre, Jr.

Attorneys:      Richard D. Burbidge and Jefferson W. Gross, Salt Lake City; and Don
                Howarth and Suzelle M. Smith, Los Angeles, California, for Appellants
                and Cross-appellees
                Ronald L. Rencher, Gordon Campbell, Mark W. Dykes, Vicki M.
                Baldwin, and Brandon J. Mark, Salt Lake City; and Dorothy Wolpert,
                Los Angeles, California, for Appellees and Cross-appellants

-----

Before Judges Orme, Davis, and Thorne.

ORME, Judge:

¶1      In February 2005, Plaintiffs, a group of present and former owners of dairy farms in Millard County, filed suit against Defendants, who own, operate, or manage the Intermountain Power Plant (IPP) in Millard County or its associated high voltage direct current transmission line.  Plaintiffs alleged that stray direct current electricity had been traveling from some IPP source to Plaintiffs' dairy farms, adversely affecting the health and productivity of their dairy herds.

¶2      In October 2009, Plaintiffs filed a petition for interlocutory appeal seeking review of the trial court's decision to preclude one of Plaintiffs' experts, Dr. Andrew Keeter, from testifying as to causation and damages.  Defendants subsequently filed a cross-appeal, challenging the trial court's ruling on the admissibility of testimony from some of Plaintiffs' other experts, namely, Lawrence Neubauer, Dr. Gerald Sheble, and Dr. Mark Shirilau.  We reverse in part and affirm in part.


BACKGROUND

I.  Factual and Procedural Background

¶3      In 1987, IPP began producing and transmitting electrical power.  IPP produces electricity in the form of alternating current (AC), converts it to direct current electricity (DC) on site, and transmits almost all of the generated power to California.  Plaintiffs

contend that after IPP began producing and transmitting power, it also began to release stray current, damaging pipes and equipment of other utilities, which demanded and received mitigation assistance and compensation from IPP.

¶4     Plaintiff Gunn Hill Dairy Properties (Gunn Hill) was established in 1997 in Millard County by farmer-owners who had successfully managed dairy operations in other locations.  By all relevant measures, Millard County should be a very favorable location for operating a dairy farm.  But contrary to expectations, Gunn Hill soon began experiencing high herd mortality rates and low milk production.  Other local dairy farms experienced similar problems.  The dairy farmers considered typical causes for their problems, such as feed, management techniques, climate, and disease, but no one was able to identify a cause.  In January 2002, Gunn Hill hired Dr. Keeter to investigate and suggest ways to improve milk production and poor herd health.  After observing the Gunn Hill operation, Dr. Keeter wrote a report for Gunn Hill, identifying numerous possible causes for the problems, including nutritional deficiencies, bad forage, weather-related stress, overcrowding, poor animal care, inattentive management, and the effects of introducing new animals into the herd.

¶5     Dr. Keeter visited Gunn Hill again in April 2002.  During that visit, he became aware of IPP and suggested that Gunn Hill test for stray current.  Based on Dr. Keeter's advice, Gunn Hill contacted Lawrence Neubauer, an electrician, to conduct electrical testing in May 2002.  After testing, Neubauer stated that he had detected high levels of stray DC.

¶6     Shortly after Neubauer's investigation at Gunn Hill, about 100 local dairy farmers and residents attended a meeting at which Neubauer reported that he had measured stray DC in the area.  The crowd was told that local dairy herd deaths and disease levels were "too high" because of the stray electricity.  Plaintiffs subsequently hired an attorney to pursue litigation and also hired Dr. Keeter; Neubauer and other electricians; and experts in electrical engineering, power plant engineering, and the behavior and characteristics of electric currents.  Plaintiffs filed suit against Defendants in February 2005, claiming that stray DC had been traveling from some IPP source to Plaintiffs' dairy farms and was adversely affecting the health and productivity of their dairy herds.

¶7     Plaintiffs designated Dr. Keeter as their expert witness on issues of causation and damages.  Their other designated expert witnesses included Neubauer, Donald Zipse, Dr. Mark Shirilau, and Dr. Gerald Sheble.

¶8    In June 2008, Defendants filed motions to preclude Plaintiffs from offering expert opinions from Dr. Keeter and Plaintiffs' other experts.  The trial court held a five-day evidentiary hearing and, in August 2009, the court issued its Ruling on Defendants' Rule 702 Motions To Exclude Testimony and Opinions Concerning Stray Current, Causation, and Damages Testimony (the Ruling).  The Ruling sustained Defendants' objections to Dr. Keeter's opinions on causation and damages, while sustaining in part and denying in part Defendants' objections to Neubauer, Zipse, Dr. Shirilau, and Dr. Sheble.  In October 2009, the court entered an order implementing the Ruling.

¶9    Plaintiffs timely filed a petition for leave to take an interlocutory appeal from the trial court's order excluding expert testimony from Dr. Keeter, framing their issue as follows:

> Consistent with the proper interpretation of the recently amended Utah R. Evid. 702, did the trial court err in excluding the opinion of Petitioners' designated veterinary expert on causation, Dr. Keeter, that the stray current found on Petitioners' farms (as demonstrated by standard electrical testing by experts the trial court did permit to give opinions) did in fact cause injury to Petitioners' dairy operations?

The petition was transferred to this court by the Utah Supreme Court.  *See* Utah Code Ann. § 78A-3-102(4) (Supp. 2011).  We granted Plaintiffs' petition for interlocutory appeal.  Defendants subsequently filed a cross-appeal, seeking review of the trial court's order on the admissibility of testimony from Neubauer, Dr. Sheble, and Dr. Shirilau.[1]

## II.  Trial Court's Ruling on Admissibility of Expert Testimony

### A.  Dr. Keeter

¶10   Dr. Keeter has been a veterinarian for over 25 years.  In 1984, he became a private veterinary practitioner at Johnson County Veterinary Services in Texas, serving more

---

[1]In briefing, Defendants state that the testimony of Donald Zipse should have been excluded.  They did not, however, explain their reasoning; therefore, we will not consider this issue.  *See State v. Thomas*, 961 P.2d 299, 305 (Utah 1998) ("It is well established that a reviewing court will not address arguments that are not adequately briefed.").

than 45 private dairy clients and more than 35 large beef clients. In 1995, he completed a residency in Dairy Production Medicine and a Masters of Preventive Veterinary Medicine. He worked as a staff veterinarian and nutritionist at County Line Dairies in Artesia, New Mexico, from 1995 to 1997 and as managing partner at Dairy Oz, a Kansas dairy farm of which he was part owner, from 1997 to 2001.[2] From 2001 to 2007, he worked as a technical service specialist at Monsanto Dairy Business. At the time of the hearing, Dr. Keeter was working as a veterinarian for Biozyme, Inc., consulting with dairies regarding production, labor, and management issues. At the June 2009 evidentiary hearing, Dr. Keeter confirmed that he planned to offer opinions regarding causation and damages, specifically (1) that stray current from IPP caused the alleged injuries to Plaintiffs' cows and (2) that Plaintiffs were damaged because their herd death rates increased and milk production decreased.

¶11    Despite Dr. Keeter's impressive credentials, the trial court concluded that his testimony on causation did not satisfy the reliability threshold of rule 702 of the Utah Rules of Evidence. The court had these criticisms: (1) Dr. Keeter's statements regarding symptoms contradicted the Merck Veterinary Manual (Cynthia Kahn ed., 9th ed. 2005), (2) Dr. Keeter failed to perform adequate differential diagnosis[3] testing on each individual dairy farm, (3) Dr. Keeter's epidemiological study was flawed, and (4) Dr. Keeter cannot establish causation based on an epidemiological study because such a study is used to establish association, not causation. The trial court also concluded that Dr. Keeter's opinions regarding damages were unreliable because Dr. Keeter (1) failed to consider overhead costs or capital investments, (2) failed to consider the sizes of individual farms to determine increased fixed costs, (3) failed to precisely separate and calculate damages for individual farms, (4) failed to justify his starting dates or fixed percentages of growth, and (5) made other errors in his calculations. The court permitted Dr. Keeter to render certain other opinions.

---

[2]Dairy Oz experienced problems with stray AC current from the farm's own wiring and from the utility that provided electrical service to the farm. Dr. Keeter was involved in a lawsuit about the stray electricity at Dairy Oz around 2001.

[3]A differential diagnosis is the process of "listing possible causes [of a problem], then eliminating all causes but one," and this method of determining causation is "widely used and recognized." *Alder v. Bayer Corp.*, 2002 UT 115, ¶¶ 61-62, 61 P.3d 1068 (citation and internal quotation marks omitted).

B. Neubauer

¶12    The trial court ruled that Neubauer was not qualified to give a reliable opinion that IPP was the source of the current he measured on Plaintiffs' farms. But the trial court ruled that he was qualified to render his other opinions and that they were sufficiently reliable to be admissible.

C. Dr. Sheble

¶13    The trial court ruled that Dr. Sheble could testify (1) that it is below the standard of care in the power industry to release stray current at levels that will harm humans, animals, or property; (2) regarding the possibility that stray current could reach the farms, subject to some limitations on the testimony; and (3) that IPP was the source of the stray current.

D. Dr. Shirilau

¶14    The trial court ruled that Dr. Shirilau was qualified to testify that (1) he agrees with Neubauer's methods and results as to Neubauer's opinions that the court ruled to be admissible; (2) the harmonics[4] measured at Plaintiffs' farms are consistent with those produced by IPP or any other 12-pulse high voltage DC transmission system; and (3) there are no viable alternatives to IPP being the source of the harmonics.

ISSUES AND STANDARDS OF REVIEW

¶15    Plaintiffs argue that the trial court erred in interpreting Utah Rule of Evidence 702 when it concluded that Dr. Keeter could not testify about (1) his opinion that stray current had caused decreased milk production and increased mortality rates in Plaintiffs' dairy herds and (2) damages based on decreased milk production and increased mortality rates in Plaintiffs' herds. In their cross-appeal, Defendants argue that the trial court erred by concluding that (1) Neubauer could testify about his electricity measurements and (2) Dr. Sheble and Dr. Shirilau could testify that IPP constituted a source, or possible source, of stray electricity.

---

[4]A harmonic is "a single oscillation whose frequency is an integral multiple of the fundamental frequency." Dictionary.com, http://dictionary.reference.com/browse/harmonics (last visited Jan. 10, 2011).

¶16 "The trial court has wide discretion in determining the admissibility of expert testimony," and we will disturb a court's exclusion of expert testimony only when it "exceeds the limits of reasonability." *Eskelson v. Davis Hosp.* (*Eskelson II*), 2010 UT 59, ¶ 5, 242 P.3d 762 (citations and internal quotation marks omitted).[5] *See also State v. Gallegos*, 2009 UT 42, ¶ 12, 220 P.3d 136 ("A trial court's denial of a party's presentation of expert testimony under Rule 702 of the Utah Rules of Evidence is reviewed under an abuse of discretion standard.").


ANALYSIS

I. Plaintiffs' Procedural Challenge to the Cross-Appeal

¶17 Defendants' cross-appeal triggers several procedural questions that we consider before we address the merits of the Ruling. Plaintiffs argue that we may not consider Defendants' cross-appeal because the issues it raises are beyond the scope of Plaintiffs' petition for interlocutory appeal, which addresses only the admissibility of Dr. Keeter's testimony. *See State v. Lusk*, 2001 UT 102, ¶ 32, 373 P.3d 1103 (declining to consider a cross-appeal because the question raised "is beyond the scope of review for which we granted [the] petition for this interlocutory appeal"). Defendants respond that they have a "right" to file a cross-appeal. Defendants note that rule 5 of the Utah Rules of Appellate Procedure, addressing interlocutory appeals, does not preclude the filing of a cross-appeal and rule 5(f) provides that "[a]ll proceedings subsequent to the granting of the petition shall be as, and within the time required, for appeals from final judgments" pursuant to rule 4. Utah R. App. P. 5(f). Rule 4, treating appeals as of right, authorizes cross-appeals. *See* Utah R. App. P. 4(d) ("If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days after the date on which the first notice of appeal was filed[.]"). Consequently, Defendants contend that they have a right to file a cross-appeal to an interlocutory appeal without first seeking permission from the appellate court even though rule 5 is silent on that matter. We agree that Defendants' basic position—that they can file a cross-appeal without first seeking permission from the appellate court—appears to be correct.

---

[5]In their briefs, both parties in this case relied on *Eskelson v. Davis Hospital* (*Eskelson I*), 2010 UT 15. They supplemented their briefs when the Utah Supreme Court amended that decision. *See Eskelson II*, 2010 UT 59.

¶18    While arguing that the rules allow them to file a cross-appeal, Defendants do not directly address Plaintiffs' objection to the cross-appeal, that is, whether the questions raised in the cross-appeal exceed the scope of Plaintiffs' petition for interlocutory appeal.  Defendants apparently assume that because the trial court ruled on Defendants' motions regarding all expert witnesses in the same court order, everything in that order is within the scope of the interlocutory appeal.[6]

¶19    We do not find much guidance regarding the proper scope of an interlocutory cross-appeal, but it is clear that there are some limits, *see Lusk*, 2001 UT 102, ¶ 32 (declining to consider a cross-appeal because the question raised was "beyond the scope of review for which [the court] granted [the] petition for [the] interlocutory appeal"). *Cf. State v. Redd*, 1999 UT 108, ¶ 9, 992 P.2d 986 (stating that rule 43(a) of the Utah Rules of Appellate Procedure, which authorizes certification of a case for immediate transfer to the Utah Supreme Court, "does not permit the court of appeals to add issues to the certification not present in the case before it") (internal quotation marks omitted). Federal courts have addressed this issue in the context of the federal statute addressing interlocutory appeals, 28 U.S.C. § 1292(b) (2006).[7]  In *United States v. Stanley*, 483 U.S. 669 (1987), the United States Supreme Court considered the scope of a cross-appeal under 28 U.S.C. § 1292(b) and stated that, for purposes of interlocutory review, "the Court of Appeals' jurisdiction is not confined to the precise question certified by the lower court (because the statute brings the '*order*,' not the *question*, before the court)." *Id.* at 677 (emphasis added).  *See City of Jacksonville v. Department of the Navy*, 348 F.3d 1307, 1310 (11th Cir. 2003) ("Although the issue of removal was not certified in the interlocutory appeal, it is properly before this Court because a [28 U.S.C.] § 1292(b) appeal brings up the entire district court order.").

---

[6]In fact, Defendants took this position in their Opposition to Appellants' Motion To Dismiss Cross-Appeal, i.e., that we have jurisdiction over the cross-appeal because it addresses the same ruling and the same order as Plaintiffs' interlocutory appeal.

[7]An appeal under 28 U.S.C. § 1292(b) is procedurally analogous to a petition for interlocutory review under rule 5 of the Utah Rules of Appellate Procedure in that it allows an appellate court, in its discretion, to consider an appeal from an order that is not otherwise appealable when "such order involves a controlling question of law . . . and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b) (2006).  It is also somewhat analogous to rule 54(b) of the Utah Rules of Civil Procedure, in that it requires the trial judge's written certification that the order is one that so qualifies.  *See id.*; Utah R. Civ. P. 54(b).

¶20 Like the federal statute on interlocutory appeals, rule 5(a) of the Utah Rules of Appellate Procedure speaks in terms of the "order" sought to be appealed rather than the "question" that was the subject of the petition for interlocutory appeal. *See* Utah R. App. P. 5(a) ("An appeal from an interlocutory *order* may be sought by any party[.]") (emphasis added). Therefore, our consideration of an interlocutory appeal is not limited to the question that was the subject of the petition for interlocutory appeal but may cover other issues raised in the underlying order. Nevertheless, while our rule allows a cross-appellant in an interlocutory appeal to raise any matter addressed in the order at issue, we do not agree that the appellate court *must* consider those issues. *See, e.g., Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Continental Carbon Co.*, 428 F.3d 1285, 1291 (10th Cir. 2005) ("Interlocutory appeals [under 28 U.S.C. § 1292(b)] originate from the district court's order itself, not the specific question certified by the district court or the specific question framed by the appellant. An appellate court can *and should* address a different legal question if it controls the disposition of the certified order.") (emphasis added) (citations omitted).

¶21 Rule 5 of the Utah Rules of Appellate Procedure is titled "Discretionary appeals from interlocutory orders," Utah R. App. P. 5, emphasizing one of the hallmarks of interlocutory appeals, i.e., the discretion appellate courts have to determine whether to consider them. Thus, under the rule, a party must petition the court of appeals for "permission to appeal" from an interlocutory order. *Id*. 5(a). Furthermore, we also have discretion to determine the scope of such an appeal if we decide to grant the petition.[8] *See id.* 5(f) ("The order permitting the appeal may set forth the particular issue

---

[8]There is good reason for vesting appellate courts with the discretion to decide not only whether to grant an interlocutory appeal, but also whether to limit the scope of a permitted interlocutory appeal. Suppose that, in ruling on a petition, we agreed to review issues A and B, but not C, all of which derive from the same order. Now suppose that a cross-appeal raises issue C. If we must consider any issue raised by a cross-appellant as long as the issue derives from the same order that the petition challenged, we could be required to consider an issue that we had previously declined to review simply because it was raised in a cross-appeal rather than the petition. Or suppose that a district court decides to issue a single order ruling on several motions, such as a motion to compel discovery, a motion in limine, and a motion for sanctions. Again, we could potentially be required to consider issues wholly unrelated to the issue raised by the interlocutory petition simply because a court drafted a comprehensive order to address unrelated motions. We do not believe that the organizational structure

(continued...)

or point of law which will be considered and may be on such terms, including the filing of a bond for costs and damages, as the *appellate court may determine*.") (emphasis added). We are naturally protective of our prerogative to exercise the discretion granted by rule 5.[9]

¶22    While rule 5 does not expressly address the subject of cross-appeals, as noted above, it provides that "[a]ll proceedings subsequent to the granting of the petition shall be as, and within the time required, for appeals from final judgments[.]" *Id*. Presumably based on this provision, and in conjunction with rule 4 of the Utah Rules of Appellate Procedure, certain practices have developed regarding interlocutory cross-appeals. Notwithstanding the language in rules 4 and 5, the very idea that once leave to file an interlocutory appeal has been granted a party can file a cross-appeal that the appellate court must consider raises concern because it potentially circumvents the appellate court's discretion in interlocutory review. And the notion that a multitude of issues could be thrust upon us without our consent by virtue of a cross-appeal is not only worrisome, *see supra* note 8, it is inconsistent with the intentionally limited scope of interlocutory review. Thus, although a cross-appeal to an appeal as of right under rule 4 may reasonably raise any issue appropriate for appeal, an interlocutory cross-appeal should not enjoy the same expansive reach.

¶23    And this is not the only instance where procedures imported from rule 4 do not necessarily make sense when applied to interlocutory appeals. The lack of express provisions regarding interlocutory cross-appeals in the Utah Rules of Appellate Procedure affects other procedural matters too. For example, like rule 5, rule 4 does not expressly state where a cross-appeal is to be filed, stating only that "[i]f a timely notice

---

[8](...continued)
chosen by a trial court in issuing its orders should dictate the scope of interlocutory review.

[9]The limits on interlocutory appeals effectively serve the same ends as the rule limiting appeals as of right to final judgments:

> [L]imiting appeals to final judgments preserves scarce judicial resources by preventing a party from prematurely appealing a nonfinal judgment, which would result in piecemeal litigation. Strict adherence to the final judgment rule also maintains "the proper relationship between this Court and the trial courts."

*Powell v. Cannon*, 2008 UT 19, ¶ 12, 179 P.3d 799 (footnotes and citations omitted).

of appeal is filed by a party, any other party may file a notice of appeal within 14 days after the date on which the first notice of appeal was filed[.]" Utah R. App. P. 4(d). However, rule 4(a) provides that appeals as of right are to be filed "with the clerk of the trial court." *Id.* 4(a). As a result, parties routinely file cross-appeals, including interlocutory cross-appeals, in the district court. But given that a petition for interlocutory appeal is filed with the clerk of the appellate court, it makes little sense to file an interlocutory *cross-appeal* in the district court.[10] Nevertheless, this has become accepted practice, and Defendants in this case did file their cross-appeal in the district court. Thus, the understandable reliance on rule 4 to fill in the procedural gaps related to interlocutory cross-appeals has led to some interesting procedural mismatches. It may well be advisable to modify the Utah Rules of Appellate Procedure to squarely address the propriety of cross-appeals in interlocutory appeals and, if they are to be permitted, to establish proper procedures for their filing.

¶24 We return to Defendants' cross-appeal in this case. We acknowledge that, under the Utah Rules of Appellate Procedure as currently framed, a cross-appellant may file a cross-appeal without first seeking permission of this court. But to the extent Defendants assume that we are *required* to address all issues raised in their cross-appeal because the trial court addressed those issues in its order, we disagree. Such an interpretation would render illusory the appellate court's discretion to carefully tailor the scope of interlocutory review. Furthermore, consistent with the plain language of rule 5(a), it appears that a cross-appellant may raise in its cross-appeal any issue that was included in the order that is the subject of the appeal, regardless of whether it relates to the question or questions on which the appellate court has decided to permit an early appeal. However, we retain the authority to limit the scope of what we will actually consider in the cross-appeal, just as we have discretion to limit the scope of the initial interlocutory appeal.[11] In the exercise of that discretion, we will consider the trial

---

[10]Considering that plenary jurisdiction over a matter shifts to the appellate court upon filing of the notice of appeal from a final judgment, it is even anomalous that a cross-appeal in a routine appeal is filed in the trial court, which previously had jurisdiction over the case, rather than in the appellate court, which obtained jurisdiction once the appeal was filed.

[11]Some federal cases seem to take this approach. These cases, while agreeing that a cross-appeal is properly before the reviewing court if it raises issues covered by the order that was the subject of the interlocutory petition, use permissive language to

(continued...)

court's Ruling regarding the admissibility of testimony from Neubauer, Dr. Sheble, and Dr. Shirilau after we discuss the court's ruling regarding Dr. Keeter's testimony, which clearly is the pivotal issue before us.

## II. Admissibility of Expert Testimony

¶25   We now consider whether the trial court correctly applied rule 702 of the Utah Rules of Evidence[12] when determining the admissibility of the testimony of Plaintiffs' proposed expert witnesses.  Quoting *Eskelson II*, Plaintiffs contend that "Dr. Keeter's testimony that he practices on large animals, particularly dairy animals[,] and has expertise in the effects of electricity on milk production and cow mortality 'constituted a threshold showing that his opinion was reliable,'" 2010 UT 15, ¶ 15, and that under rule

---

[11](...continued)
describe the scope of the issues before the court.  *See, e.g., Burlison v. McDonald's Corp.*, 455 F.3d 1242, 1248 (11th Cir. 2006) ("[U]pon agreeing to address an interlocutory appeal, courts *may* review all the matters in the district court's order[.]") (emphasis added).

[12]Rule 702 provides as follows:
>    (a)  Subject to the limitations in subsection (b), if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>    (b)  Scientific, technical, or other specialized knowledge may serve as the basis for expert testimony if the scientific, technical, or other principles or methods underlying the testimony meet a threshold showing that they (i) are reliable, (ii) are based upon sufficient facts or data, and (iii) have been reliably applied to the facts of the case.
>    (c)  The threshold showing required by subparagraph (b) is satisfied if the principles or methods on which such knowledge is based, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community.

Utah R. Evid. 702.

702, a qualified doctor whose specialized knowledge is unchallenged does not need to make any additional showing of his methodology to testify about causation. Although acknowledging that reliability is the touchstone of admissibility, Defendants contend that "a proposed expert witness must have highly specific expertise that is directly applicable to the issues presented in the case and such expertise must be undisputed." In our view, Plaintiffs' articulation understates the requirement for admissibility of expert testimony, and Defendants' version overstates it. Under Utah law, the applicable standard falls somewhere in between.

## A. Plaintiffs' Objection to the Trial Court's Reliance on Federal Law

¶26    Plaintiffs argue that the trial court erred in interpreting rule 702 of the Utah Rules of Evidence, in part because it relied on inapplicable federal authority. While Utah Rule of Evidence 702(a) is identical to Federal Rule of Evidence 702, the Utah Legislature added subsections (b) and (c) to the rule in 2007. Deeming federal precedent on expert testimony helpful in interpreting rule 702, even though the federal rule lacks subsections (b) and (c), the trial court's Ruling discussed *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*Daubert I*), 509 U.S. 579 (1993), and the Ninth Circuit court's decision on remand, *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*Daubert II*), 43 F.3d 1311 (9th Cir.), *cert. denied*, 516 U.S. 869 (1995), as well as *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). In particular, the court noted that *Daubert II* stated that proponents of expert testimony "must show that the expert's findings are based on sound science, [which] will require some objective, independent validation of the expert's methodology," and that "the party proffering the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully." *Daubert II*, 43 F.3d at 1316, 1319 n.11. Plaintiffs criticize the trial court for relying on this language, contending that the court imported an evidentiary standard from *Daubert II* that is inconsistent with Utah law.

¶27    Utah evidentiary rules are not always the same as the Federal Rules of Evidence, and Utah courts have been careful to recognize those differences when ruling on evidentiary issues.[13] "[T]he 2007 amendment to [rule 702] preserves and clarifies

---

[13]*See, e.g., State v. Crosby*, 927 P.2d 638, 641-42 (Utah 1996) (comparing the federal standard announced in *Daubert I* with the more rigorous standard outlined by the Utah Supreme Court in *State v. Rimmasch*, 775 P.2d 388 (Utah 1989)); *Phillips v. Jackson*, 615 P.2d 1228, 1234 (Utah 1980) (abandoning the *Frye* test used in federal courts in favor of

(continued...)

differences between the Utah and federal approaches to expert testimony." Utah R. Evid. 702 advisory committee note. The advisory committee note expressly recognizes this, stating that "[u]nlike the federal rule, . . . the Utah rule notes that the proponent of the testimony is required to make only a 'threshold' showing." *Id.*

¶28 Nevertheless, the advisory committee note refers to and relies on federal cases, stating, for example, that (1) rule 702 follows federal law as announced in *Kumho Tire*, insofar as the rule is intended to be applied to all expert testimony; (2) "like its federal counterpart, Utah's rule assigns to trial judges a 'gatekeeper' responsibility to screen out unreliable expert testimony"; (3) "[s]ection (c) retains limited features of the traditional *Frye* test[14] for expert testimony"; and (4) section (b) adopts the three general categories of inquiry for expert testimony contained in the federal rule. Utah R. Evid. 702 advisory committee note. Consistent with this approach, the Utah Supreme Court has relied on federal cases when considering evidentiary issues under rule 702, both before and after the rule was amended.[15]

---

[13](...continued)
an "inherent reliability" standard); *Haupt v. Heaps*, 2005 UT App 436, ¶ 23, 131 P.3d 252 (noting that, following the decision in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Utah Supreme Court has reiterated that the *Rimmasch* test "applies only to novel scientific methods and techniques"), *cert. denied*, 132 P.3d 683 (Utah 2006); *Dikeou v. Osborn*, 881 P.2d 943, 946 n.5 (Utah Ct. App. 1994) (declining to apply the *Daubert I* standard in light of Utah authority regarding admissibility of an affidavit on the appropriate standard of care).

[14]The *Frye* test originated with *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

[15]For example, after the 2007 amendment, the Utah Supreme Court in *State v. Clopten*, 2009 UT 84, 223 P.3d 1103, referred approvingly to *United States v. Telfaire*, 469 F.2d 552, 558-59 (D.C. Cir. 1972); *United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir. 1984); *United States v. Downing*, 753 F.2d 1224, 1226 (3d Cir. 1985); and *United States v. Moore*, 786 F.2d 1308, 1313 (5th Cir. 1986). *See Clopten*, 2009 UT 84, ¶¶ 23, 28. And in *Eskelson II*, the Court referred approvingly to *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003); *Atkinson Warehousing & Distrib., Inc. v. Ecolab, Inc.*, 99 F. Supp. 2d 665, 670 (D. Md. 2000); and *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993). *See* 2010 UT 59, ¶ 16. Before the 2007 amendment, in *Alder v. Bayer Corp.*, 2002 UT 115, 61 P.3d 1068, the Utah Supreme Court referred favorably to *Kennedy*
(continued...)

¶29 Therefore, while the trial court's analysis would have been incomplete if it relied *solely* on federal authority or strictly applied the standard described in the *Daubert II* language quoted in the Ruling, there was nothing inherently wrong with the court's consideration of federal case law nor was there any discernible error in the way it treated that case law.

B. Current Law Regarding Rule 702 of the Utah Rules of Evidence

¶30 Rule 702 requires a trial court to consider several factors when determining whether expert testimony is admissible. Under section 702(a), the court must first consider whether expert testimony would be helpful in assisting the trier of fact and whether the proposed expert has the necessary knowledge, skill, experience, training, or education to provide such assistance to the trier of fact. *See Eskelson II*, 2010 UT 59, ¶ 9. Under section 702(b), the court then turns to the reliability of the scientific, technical, or other specialized knowledge that serves as the basis for the expert's testimony. *See id.* (citing Utah R. Evid. 702(b)). Prior to the 2007 amendment, "the standard for determining the admissibility of technical or scientific expert testimony was that announced in *State v. Rimmasch*, 775 P.2d 388, 402-05 (Utah 1989)." *Eskelson II*, 2010 UT 59, ¶ 10. The *Rimmasch* standard required courts to determine (1) "whether the party had met its threshold burden by examining the 'correctness of the scientific principles underlying the testimony, the accuracy and reliability of the techniques utilized in applying the principles to the subject matter before the court and in reaching the conclusion expressed in the opinion, and the qualifications of those actually gathering the data and analyzing it,'" and (2) "whether 'the scientific principles or techniques had been properly applied to the facts of the particular case by qualified persons and whether the testimony was founded on that work.'" *Id.* (quoting *Rimmasch*, 775 P.2d at 398 n.7, 403) (alterations omitted). "Aspects of the *Rimmasch* test continue to be applicable under amended rule 702." *Id.* ¶ 11. For example, section 702(b) requires the court "to determine whether a party has met its threshold burden to show the reliability of the principles that form the basis for the expert's testimony and the reliability of applying those principles to the facts of the case," and section 702(c) "allows the court to take judicial notice of principles that have been accepted by the relevant expert community." *Id.*

---

[15](...continued)
*v. Collagen Corp.*, 161 F.3d 1226, ¶¶ 60-61 (9th Cir. 1998), and *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). *See* 2002 UT 115, ¶¶ 20, 61, 65, 70, 80.

¶31    While both parties' supplemental briefs focus on paragraph 15 of *Eskelson II*,[16] we note that the three significant lessons of *Eskelson II* go well beyond that single paragraph. First, the trial court performs an important gatekeeping function, intended to ensure that only reliable expert testimony will be presented to the jury. We accord the trial court broad discretion in that role and will reverse its decision only when it exceeds the bounds of "reasonability." *See id.* ¶ 5.

¶32    Second, while the requirements to establish a threshold showing of reliability are low in a rather straightforward case like the one considered in *Eskelson I* and *Eskelson II*, which turned on the proper methodology for extracting a foreign object from a child's ear, the Utah Supreme Court has indicated that the trial court must become more involved, and its gatekeeping role becomes more challenging out of necessity, as the case and expert testimony become more complex. *See id.* ¶ 15 ("What is required for a threshold showing of reliability will vary depending on the complexity of the particular

---

[16]Paragraph 15 of *Eskelson II* states:

> Dr. Bateman's testimony regarding his experience as a physician, in dealing with similar situations as Jacob's, constitutes a threshold showing of reliability. In this case, amended rule 702 requires no more. Under Utah Rule of Evidence 702(b)([i]), the district court was required to determine whether the methods and principles underlying Dr. Bateman's specialized knowledge were reliable. What is required for a threshold showing of reliability will vary depending on the complexity of the particular case. In this case, the fact that Dr. Bateman had experience with the removal of foreign objects from the ears of children satisfies the threshold showing that his testimony was reliable. Identification of a methodology is not necessary where exposure to a nearly identical situation forms the basis of the expert's opinion. Because Dr. Bateman's expertise was unchallenged, his specialized knowledge met the threshold showing of reliability required for the admission of his expert testimony.

2010 UT 59, ¶ 15. Most of the language in *Eskelson II's* paragraph 15 is the same as in paragraph 15 of *Eskelson I*; the only significant change in *Eskelson II* is the addition of the sentence that states: "What is required for a threshold showing of reliability will vary depending on the complexity of the particular case." *Id.*

case."). Thus, while it may seem unusual that the court in this case held a five-day evidentiary hearing on the admissibility of expert testimony, ultimately producing a ruling in excess of forty pages, it is inarguable that this case involves some very complex and very technical scientific questions. When performing their gatekeeping function,

> judges should approach expert testimony with "rational skepticism." But the "degree of scrutiny [that should be applied to expert testimony by trial judges] is not so rigorous as to be satisfied only by scientific or other specialized principles or methods that are free of controversy or that meet any fixed set of criteria fashioned to test reliability."

*Id*. ¶ 12 (alteration in original) (quoting Utah R. Evid. 702 advisory committee note).

¶33    Third, subsections (b) and (c) of rule 702 require a party to make only a threshold showing of reliability. *See id.* (citation and internal quotation marks omitted). "When interpreting an evidentiary rule, we apply principles of statutory construction. Thus, we first look to the plain language of the rule." *State v. Vargas*, 2001 UT 5, ¶ 31, 20 P.3d 271 (citation omitted). We note that Webster's defines "threshold" as "the place or point of entering or beginning: entrance, outset." Webster's Third New International Dictionary 2383 (1993). Accordingly, a trial court's consideration of whether expert testimony satisfies a "threshold showing" of reliability, Utah R. Evid. 702(b), marks only the *beginning* of a reliability determination. It is up to the trier of fact to determine the ultimate reliability of the evidence. Consistent with the meaning of "threshold," the advisory committee note states as follows regarding the required "threshold showing":

> That "threshold" requires *only a basic foundational showing of indicia of reliability* for the testimony to be admissible, not that the opinion is indisputably correct. When a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable. The amendment is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise. Contrary and inconsistent opinions may simultaneously meet the threshold; it is for the factfinder to reconcile—or choose between—the different opinions.

Utah R. Evid. 702 advisory committee note (emphasis added). This explanation emphasizes the preliminary nature of the court's obligation to determine whether the proposed expert testimony satisfies a "threshold showing" of reliability. With these concepts in mind, we now consider the trial court's application of rule 702 to the particular experts in this case.

### III. Admissibility of Dr. Keeter's Testimony

#### A. Dr. Keeter's Qualifications

¶34    Defendants argue that Dr. Keeter's experience is neither highly specific nor directly applicable; therefore, they contend, he does not have sufficient relevant experience with the issues involved in this case, including the effects of DC electricity on dairy cows. As a result, Defendants contend that Dr. Keeter is not qualified to testify regarding causation under Utah Rule of Evidence 702(a). Similarly, Defendants contend that Dr. Keeter is not an agricultural economist and has no formal education in accounting, finance, or economics; therefore, Defendants argue, he is not qualified to testify about damages.

¶35    While the trial court did not expressly state that Dr. Keeter was qualified under rule 702(a), that conclusion is implicit in the Ruling, which describes his background and credentials in detail and then focuses on the reliability of his testimony. The court's exclusion of much of Dr. Keeter's testimony was based on the lack of reliability pursuant to rule 702(b) rather than the sufficiency of Dr. Keeter's training and experience. We see no error in the court's implicit finding that Dr. Keeter qualifies as an expert by reason of his "knowledge, skill, experience, training, or education." Utah R. Evid. 702(a).

#### B. Testimony Regarding Causation

¶36    In considering the reliability of Dr. Keeter's testimony related to causation, the trial court stated that "his methods of determining causation here are inherently unreliable under Rule 702." The court first criticized Dr. Keeter on the ground that his testimony was inconsistent with the Merck Veterinary Manual (the Manual) because, "[w]hile Dr. Keeter states that exposure to stray current causes reduction in animal performance and will negatively affect animal behavior," the Manual states that those signs are often caused by factors other than stray current and that "numerous controlled studies" showed no evidence of those signs.

¶37 We note that Dr. Keeter cited the Manual as stating that "no one sign is pathognomic."[17] He then stated that "there is increased risk of any disease associated with decreased energy intake, decreased water intake, or increased stress . . . . Sudden exposures to increase[d] stray current can cause significant and immediate reduction in animal performance." The trial court noted, "According to the Manual,[18] . . . controlled studies have *not* shown that stray current causes the aforementioned problems [including but not limited to abnormal behavior during milking, refusal of feed or water, and increased mastitis] in cattle, and such signs are not causation evidence of stray current."

¶38 In so ruling, it appears the trial court confused the concepts of *diagnosis* with *effects* of stray current. As quoted by the court, the Manual addressed the perils of using symptoms to *diagnose* stray voltage problems, while the portion of Dr. Keeter's report that the court found problematic addressed the *effects* of stray current on cattle. Thus, Dr. Keeter's statement that exposure to stray current may cause a reduction in animal performance and negatively affect animal behavior is not inconsistent with the Manual's position that animal behavior does not provide a basis for diagnosing stray voltage problems. We also note that Dr. Keeter's rule 26 report refers to other studies to support his position.[19] Thus, even if we agreed that Dr. Keeter's statement regarding

---

[17]Pathognomic means "specially, distinctively, or decisively characteristic of a particular disease." Webster's Third International Dictionary 1655 (1993).

[18]The trial court quoted the following excerpt from the Manual:
> [N]one of these signs [including but not limited to abnormal behavior during milking, refusal of feed or water, and increased mastitis] were evident in numerous controlled studies. These signs are often caused by other factors . . . . Therefore, animal behavior or other signs cannot be used to diagnose stray voltage problems. The only way to determine if stray voltage is a potential cause of abnormal behaviors or poor performance is to perform electric testing.

Merck Veterinary Manual 1698 (Cynthia Kahn ed., 9th ed. 2005).

[19]Dr. Keeter's rule 26 report states, citing as authority Douglas J. Reinemann et al., Review of Literature on the Effect of the Electrical Environment on Farm Animals,
(continued...)

the negative effects of stray current was inconsistent with the Manual, this would not by itself render Dr. Keeter's testimony unreliable given that Dr. Keeter relied on other sources for support. And the mere fact that Dr. Keeter may have an opinion at odds with a treatise is not, of itself, disqualifying. Given the array of experts and the number of treatises, this will often be the case, and such disputes will ordinarily be a matter for the factfinder to resolve, provided the expert's opinion meets the threshold requirement of rule 702. It is not the court's task to reconcile a conflict between experts, or between experts and treatises. *See* Utah R. Evid. 702 advisory committee note ("Contrary or inconsistent opinions may simultaneously meet the threshold; it is for the factfinder to reconcile—or choose between—the different opinions.").

¶39     The trial court next criticized the differential diagnosis testing. The court apparently did not object to the use of the differential diagnosis method per se, but found that Dr. Keeter's methods and data did not satisfy rule 702 because he failed to perform thorough, detailed investigations of each individual dairy farm and did not perform water meter testing on Plaintiffs' farms as he did when investigating Dairy Oz. The court also found Dr. Keeter's epidemiologic techniques inadequate because he did not review veterinary or nutritionist records for each individual farm, did not interview Plaintiffs from every dairy, and included Plaintiffs' dairies in the control group of his study, thus committing a "fundamental flaw."

¶40     Dr. Keeter explained his decision to forego water meter testing, stating that it would not have been useful because, unlike at Dairy Oz, he could not "turn off" the stray current at Plaintiffs' farms and therefore could not obtain data on water consumption in the absence of stray current for comparison.[20] Plaintiffs also contend that Dr. Keeter accounted for individual differences among the farms when he performed the damages analysis. Regarding the trial court's criticism that Dr. Keeter did not perform a thorough investigation of each farm, the fact that his testing was

---

[19](...continued)
Univ. of Wisc. (2005), that "[n]umerous peer reviewed papers acknowledge behavioral changes in cattle when exposed to various low levels of stray currents."

[20]Defendants take issue with this reasoning, persuasively contending that any skilled veterinarian can predict the average amount of water a dairy cow should consume on a daily basis. However, "[c]ontrary and inconsistent opinions may simultaneously meet the threshold" of reliability under rule 702, and it is for the factfinder to reconcile those differing opinions. Utah R. Evid. 702 advisory committee note.

superficial at some farms does not make the evidence inadmissible, although it may lessen the value of his expert testimony. Furthermore, even if the court were correct, that would not render the evidence inadmissible as to those farms for which Dr. Keeter did perform adequate differential diagnosis testing.

¶41    Dr. Keeter also explained that his investigatory approach changed to include epidemiological techniques once he discovered the presence of stray current. He stated as follows:

> From 2002 to 2007, I was aware of specific problems on a few dairies and tried to address all of these without regard to stray current. When I was retained in 2007 and learned of all of the dairies, it became obvious that the symptoms exhibited by all dairies were similar and fit the definition of an epidemic.

Thus, instead of considering each farm individually and trying to rule out all causes but one at each individual farm, he refocused his attention on finding a single common factor. He found that the only factor common to all farms was the presence of stray current.

¶42    We are persuaded that the trial court's criticisms of Dr. Keeter's epidemiologic techniques are less significant than the court believed. We note that Dr. Keeter explained his reasoning for not reviewing the specific records at issue. When asked whether his epidemiological study was fundamentally flawed because the control group that he ultimately compared to Plaintiffs' farms (i.e., the affected population) included Plaintiffs' farms, Dr. Keeter acknowledged that it is best to exclude the affected population from the control group. But he also explained that such an error would dilute the results and skew them in favor of Defendants. Furthermore, he explained that Plaintiffs' farms constituted a small fraction of the total number of farms in Utah, so the effect of including them in the control group was minimal in any event.

¶43    We do not agree with the trial court that these errors render Dr. Keeter's conclusions unreliable. As the *Reference Manual on Scientific Evidence* makes clear,

> [i]t is important to emphasize that most [epidemiological] studies have flaws. Some flaws are inevitable given the limits of technology and resources. In evaluating epidemiologic evidence, the key questions, then, are the extent to which a study's flaws compromise its findings and

> whether the effect of the flaws can be assessed and taken
> into account in making inferences.

Federal Judicial Center, *Reference Manual on Scientific Evidence* 337 (2d ed. 2000) (footnote omitted).  Because no epidemiological study is flawless, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.  Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects[.]"  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (footnote and citation omitted), *cert. denied*, 537 U.S. 1110 (2003).  *See In Re Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1240 (W.D. Wa. 2003) (stating that, as long "as the court finds the methodology scientifically sound, any flaws that might exist go to the weight [of the evidence], not its admissibility").

¶44    Finally, the trial court noted a concern that epidemiological studies are not sufficient to establish causation.[21]  We think that concern is overstated.  Courts have recognized that epidemiological studies can provide "powerful evidence of causation." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002).  The trial court acknowledged that epidemiological studies can provide evidence of causation "under specific circumstances and in conjunction with other evidence."  In addition, Plaintiffs point out that Dr. Keeter also considered the Bradford-Hill[22] criteria when reaching his opinion about causation.

---

[21]The trial court quoted the following excerpt from the *Reference Manual on Scientific Evidence*:

> [I]t should be emphasized that *an association is not equivalent
> to causation*.  An association identified in an epidemiologic
> study may or may not be causal.  Assessing whether an
> association is causal requires an understanding of the
> strengths and weaknesses of the study's design and
> implementation, as well as a judgment about how the study
> findings fit with other scientific knowledge.

Federal Judicial Center, *Reference Manual on Scientific Evidence* 336-37 (2d ed. 2000) (emphasis in original) (footnotes omitted).

[22]The Bradford-Hill criteria are "broadly accepted criteria for evaluating causation that have been developed by scientists."  *Gannon v. United States*, 292 Fed. App'x 170, 173 n.1 (3d Cir. 2008).

¶45    As we have noted, many of the trial court's criticisms reflect its concerns best reserved for the weight of the evidence rather than its threshold reliability for purposes of admissibility, thus going beyond the scope of the court's gatekeeping responsibility under rule 702. As a result, these criticisms do not constitute valid reasons for excluding Dr. Keeter's testimony regarding causation.

## C. Testimony Regarding Damages

¶46    The trial court also concluded that Dr. Keeter's opinions regarding damages were unreliable because Dr. Keeter (1) failed to consider overhead costs or capital investments, (2) failed to consider the sizes of individual farms to determine increased fixed costs, (3) failed to precisely separate and calculate damages for individual farms, and (4) failed to justify his starting dates or fixed percentages of growth. Similar to the court's criticisms of Dr. Keeter's causation testimony, these criticisms go to the weight of the testimony, not its threshold reliability for purposes of admissibility. As a result, they are not valid reasons for excluding Dr. Keeter's testimony.

## D. Reliability vs. Weight

¶47    We recognize that a trial court's responsibility to assess the admissibility of expert testimony pursuant to rule 702 is an important one. We commend the trial court's diligence in undertaking that obligation in this particularly challenging case. Under the rule, the line between assessing reliability and weighing evidence can be elusive. But the trial court may not cross that line when assessing threshold reliability for purposes of ruling on admissibility pursuant to rule 702. The court's role is only preliminary; the factfinder bears the ultimate responsibility for evaluating the accuracy, reliability, and weight of the testimony.

¶48    This is not to say that we disagree with all of the trial court's concerns. But many of the court's criticisms challenged the weight of the evidence, not its threshold reliability, and some of its statements indicate that the court may have gone beyond its role as gatekeeper and into the factfinder's territory. We conclude that the court exceeded its discretion by requiring more than a threshold showing of reliability when it determined that Dr. Keeter's testimony was inadmissible.

## IV. Admissibility of Testimony from Neubauer, Dr. Sheble, and Dr. Shirilau

¶49    Defendants' cross-appeal challenges the trial court's Ruling regarding the admissibility of expert testimony from Neubauer, Dr. Sheble, and Dr. Shirilau. Our assessment of the trial court's Ruling in this regard may be succinctly stated. After

carefully reviewing the court's Ruling, we see no error in its decision regarding the proposed expert testimony of Neubauer, Dr. Sheble, and Dr. Shirilau. A trial court has wide discretion in determining the admissibility of expert testimony, and as discussed above, we will not disturb the court's decision unless it exceeds the limits of reasonability. *See Eskelson II*, 2010 UT 59, ¶ 5. Based on the court's analysis with respect to these witnesses, we cannot say that its decision exceeds the limits of reasonability. On the contrary, its determination that these experts' proposed opinions are sufficiently reliable to pass muster under rule 702 is sound.

CONCLUSION

¶50   We conclude that the trial court's reasoning regarding the admissibility of Dr. Keeter's opinions was flawed and, as a result, its exclusion of that evidence exceeded the bounds of sound discretion. We see no error in the court's reasoning with respect to the testimony of Neubauer, Dr. Sheble, and Dr. Shirilau. Accordingly, we reverse the court's Ruling as it concerns Dr. Keeter and decline to disturb it as it concerns Neubauer, Dr. Sheble, and Dr. Shirilau.

_____
Gregory K. Orme, Judge

-----

¶51   WE CONCUR:

_____
James Z. Davis, Judge

_____
William A. Thorne Jr., Judge