2013 UT App 49

# THE UTAH COURT OF APPEALS

STATE OF UTAH,

*Plaintiff and Appellee,*

*v.*

ISAAC LIEVANOS,

*Defendant and Appellant.*

Opinion
No. 20110432-CA
Filed February 28, 2013

Third District, Salt Lake Department
The Honorable Royal I. Hansen
No. 081901868

David M. Corbett, Steve S. Christensen, and Craig L. Pankratz,
Attorneys for Appellant
John E. Swallow and John J. Nielsen, Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion,
in which JUDGES CAROLYN B. MCHUGH
and J. FREDERIC VOROS JR. concurred.

ORME, Judge:

¶1 Defendant appeals from convictions on five counts of aggravated kidnapping, *see* Utah Code Ann. § 76-5-302 (LexisNexis 2012); one count of aggravated burglary, *see id.* § 76-6-203; and one count of aggravated robbery, *see id.* § 76-6-302, all first degree

felonies, each with an in-concert enhancement, *see id.* § 76-3-203.1 (LexisNexis 2008).[1] We affirm.

## BACKGROUND

¶2    Around midnight on March 3, 2008, a woman woke to a large crashing sound and was suddenly pulled from her bed and thrown to the floor. She and four others—her son, two of his friends, and another resident of the home—were forced into the living room, at gunpoint, by intruders. Demanding money and drugs, the intruders tied the victims up with electrical cords and ransacked the house. After taking electronics, tools, and jewelry, they fled out the back door when one of the intruders answered his cell phone and yelled, "Policia!"

¶3    Meanwhile, a neighbor had seen two suspicious looking cars—one white and one gray—arrive at the residence, had seen several men emerge from the vehicles and rush into the house with weapons, and had instructed his sister to call the police, who soon responded. The victims reported that at least two of the intruders had flashlights and wore masks. The victims said they had been repeatedly told that if they looked up they would be shot. Based on the various voices they heard, they believed there were at least three men involved. The victims said the cell phone's ringtone sounded like Spanish or mariachi music. One of the intruders was reported to have worn white or off-white gloves. White wax had been spilled all over one of the rooms in the home after one of the

---

1. The other statutory provisions have not been materially changed since the incident at issue in this case. Accordingly, we cite the current version of the Utah Code with respect to those provisions, as a convenience to the reader. Section 76-3-203.1 has, however, been significantly amended. *See* Utah Code Ann. § 76-3-203.1 (LexisNexis 2012). Accordingly, we cite the version of this provision that was in effect at the time of the incident. *See id.* § 76-3-203.1 (LexisNexis 2008).

intruders upset a candle warmer while using its cord to tie up the victims.

¶4     Police began searching for the intruders and found Defendant and another man hiding behind a shed several blocks away. Defendant had a cell phone with a ringtone that played Spanish or mariachi music.[2] Defendant's companion had a flashlight in his pocket and white wax all over his pants. Among other items, a shotgun, a camera that had been stolen from the house, a flashlight, a ski mask, and a pair of off-white gloves were found scattered in nearby yards.

¶5     Defendant initially told police that he and his companion were in the area looking for car stereos to steal but had not been involved with the home invasion and kidnapping. At trial, however, Defendant testified that he had lied to police the night of the robbery. He claimed that he had actually gone to a party that night. While at the party, some members of the group decided to go somewhere else. Defendant testified that he decided to go along with them and climbed into a gray car. The vehicle was following a white car when Defendant overheard the others talking as if they were plotting something. Because he was "the kind of person that does not like to be in trouble," Defendant asked to be let out, and he wandered around the neighborhood for fifteen or twenty minutes. Defendant said he then saw some of the others running toward him and yelling for him to run as well. He began to run, hid behind a shed, and was arrested soon after.

¶6     At trial, testimony was given by a DNA analyst from the Utah State Crime Lab who had processed some of the evidence. She had initially concluded that DNA found on the ski mask and the white gloves had a significant statistical match to Defendant's DNA profile. She outlined her findings in an official report submitted on August 3, 2009, and a corrected report a few days

---

2. Defendant denied at trial that his ringtone was mariachi music, pointing out that it did not include any music produced by brass instruments.

later. The corrected report took into account updates to crime lab software that had not been installed on the analyst's computer the first time she ran the report. The analyst followed Utah State Crime Lab procedures by including her findings in a formal report that was technically reviewed and signed by another DNA expert.

¶7    After the second report was issued but before trial, new recommendations for how statistical chances of DNA matches should be calculated were issued by the Scientific Working Group on DNA Analysis Methods (SWGDAM). SWGDAM guidelines are not mandatory but are followed by the Utah State Crime Lab as general guidelines and viewed as best practices. A prosecutor contacted the analyst prior to trial and asked if there would be any change in the statistical match between Defendant's DNA and the evidence if the new SWGDAM recommendations were applied. The analyst ran the new numbers and determined that there would be a change. While the new statistical calculations did not exclude a match between Defendant and one of the gloves and ski mask, the numbers were now in a range considered scientifically "inconclusive." However, the new calculations still supported a high statistical match between Defendant and DNA found on the cuff of the other glove. According to the updated calculations, the chances that the DNA found on this glove belonged to someone other than Defendant ranged from 1 in 450 billion to 1 in 82 quadrillion.[3] These estimates were reviewed and approved by another crime lab employee, but a new formal report was not issued.

---

3. To put these odds in perspective, 450 billion is roughly sixty-three times the current population of the Earth. *See WorldPOPClock*, U.S. CENSUS BUREAU (Feb. 7, 2013, 3:25 p.m.), http://www.census.gov/population/popclockworld.html. On the other end of this statistical spectrum, eighty-two quadrillion is more than five thousand times the national debt. *See The Debt to the Penny and Who Holds It*, BUREAU OF THE PUB. DEBT, U.S. DEP'T OF THE TREASURY (Feb. 6, 2013, 11:30 a.m.), http://www.treasurydirect.gov/NP/BPDLogin?application=np. In other words, the glove fits.

¶8     The analyst sent the requested numbers to the prosecutor in an e-mail rather than issuing a new formal report because "there was no need to generate a new laboratory report" under the crime lab's practices. The analyst explained that the e-mail did not "replace what was done in 2009" because "[i]n 2009 the case was finished, and it was under the correct guidelines at that time, and it is not our practice or procedure to go back and update every single report when SWGDAM or the FBI come through with a new guideline." She explained this policy exists because "[o]therwise, we would always have to go back and rechange every report for every single case. So there are times that we are asked to apply the new guidelines just as a side issue to a case that was done in the past." She also explained that another technical review and formal report were unnecessary because there had been no change to the underlying DNA sample or data. While issuing a new, corrected report is required when there is "deviation" or "nonconformance," all that had changed in this case was the recommended statistical analysis for the previously—and correctly—gathered data.

¶9     Defendant made no objection to the analyst's initial testimony, her certification by the trial court as an expert witness, or her use of the numbers sent by e-mail during her testimony. Instead, Defendant grilled the analyst about the reporting methods she had used. Defendant then called his own DNA expert.

¶10    After both experts had finished testifying and been excused, Defendant moved to exclude all of the analyst's previous testimony "under Rule 702." Defendant did not explain which provision of rule 702 of the Utah Rules of Evidence the analyst failed to meet or the grounds for striking two days of testimony. Defendant merely requested that the testimony be stricken and then quoted large portions of rule 702. The trial court, apparently able to deduce the essence of Defendant's concern, addressed it thus: "[The analyst] appears to be qualified and satisfies the requirements of Rule 702." As to her testimony and the report on which it was based, the trial court determined that "the Defense has every right to raise

questions regarding the adequacy of that report," and ruled that its credibility was an issue for the jury. Defendant now appeals.

## ISSUE AND STANDARD OF REVIEW

¶11 Defendant claims the trial court abused its discretion in failing to strike the testimony of the analyst. "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). We will only reverse if the "decision exceeds the limits of reasonability." *Id.*

## ANALYSIS

¶12 Defendant argues that by allowing the jury to determine the credibility of the analyst's report, "the trial court abandoned its non-delegable gatekeeping function and, therefore, abused its discretion by failing to strike [the analyst's] testimony." Trial courts, however, have only a "preliminary . . . obligation to determine whether the proposed expert testimony satisfies a 'threshold showing' of reliability." *Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 33, 269 P.3d 980. This court has adopted the definition of "threshold showing" found in the advisory committee note to rule 702 of the Utah Rules of Evidence, i.e., "'*a basic foundational showing of reliability.*'" *Id.* (quoting Utah R. Evid. 702 advisory committee note) (emphasis in original). Meeting this threshold is only the "*beginning* of a reliability determination," however, and once the trial court has determined expert testimony meets this initial showing of reliability, "[i]t is up to the trier of fact to determine the ultimate reliability of the evidence." *Id.* (emphasis in original).

¶13 We conclude that the trial court did not exceed the limits of reasonability by determining that the analyst's testimony met the preliminary threshold required under *Gunn Hill Dairy*. *See id.* ¶ 33.

The analyst repeatedly testified that she followed the procedures and guidelines established at the Utah State Crime Lab in preparing the reports and calculations she shared at trial, and Defendant does not challenge the validity of her methodologies or calculations. In fact, the change in statistical analysis worked to Defendant's advantage because it excluded two bits of evidence that the earlier analysis would have permitted. And again, the changed analysis was only the result of applying new recommendations from SWGDAM—a group the Utah State Crime Lab looks to for guidelines, not mandates.

¶14    Defendant claims both experts testified that sending the new statistical calculations by e-mail and failing to have the new numbers documented in a formal, technically reviewed report "fell short of the generally accepted scientific standards and varied from the state crime laboratory's own standards." But this is simply not true. The analyst testified that the decision not to issue a new report was in full conformity with the practices of the Utah State Crime Lab. And while Defendant's own DNA expert testified that "best science" dictates following SWGDAM's recommendation to have results technically reviewed by another scientist, he also stated: "It is important to note that these are guidelines. SWGDAM hasn't come out and said you have to adhere to these. [It] is not something that a crime laboratory has to go and apply these. It is not forced. It is not an absolute standard."

¶15    While her testimony may have raised some questions of ultimate reliability, as noted by the trial court, it was not unreasonable for the trial court to find that the analyst's testimony demonstrated enough reliability to meet the "basic foundational showing" required by *Gunn Hill Dairy*. *See id.* It was therefore also entirely appropriate, and not an abandonment of its gatekeeping function, for the trial court to leave the ultimate question of credibility regarding the analyst's testimony to the jury.

CONCLUSION

¶16    Because we conclude the trial court did not abuse its discretion by refusing to strike the DNA analyst's testimony, we affirm.

———