2013 UT App 199

## THE UTAH COURT OF APPEALS

TRACIE P. JOHNSON,
Plaintiff and Appellee,
*v.*
LUZ ADRIONA MONTOYA,
Defendant and Appellant.

Opinion
No. 20120223-CA
Filed August 8, 2013

Third District, Salt Lake Department
The Honorable John Paul Kennedy
No. 080920603

Scott W. Christensen and Joel D. Taylor, Attorneys
for Appellant
David R. Ward, Steven R. Bangerter,
William E. Frazier, and Daniel P. Wilde, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN concurred.

ORME, Judge:

¶1     Luz Montoya appeals the trial court's denial of her motion
for a new trial, arguing that the trial court abused its discretion in
permitting certain expert testimony. We affirm.

BACKGROUND

¶2     In August 2007, Montoya was driving northbound on I-15
in Salt Lake County. She entered a lane that was already occupied
by a tractor-trailer being driven by Tracie Johnson. The two

collided, and Johnson was injured. Johnson sued for damages, and the matter went to trial.

¶3     A vocational expert appeared on behalf of Johnson and testified that the extent of Johnson's injuries shortened her work life and decreased her future earning capacity by at least 50% and by as much as 69%. The vocational expert reached her conclusions based on her own observations of Johnson, Johnson's medical records, accident reports, worker's compensation records, questionnaires she developed for the purpose of assessing functionality, and employment data from sources that included the American Community Survey and the Current Population Survey. Montoya challenged the foundation of the vocational expert's testimony and was given the opportunity to conduct voir dire of the expert outside of the jury's presence. After some questioning, the court overruled Montoya's objections, stating, "Well, I think we've taken enough time. . . . [The vocational expert has] also testified with respect to why she thinks that this particular study, among others, applies. So I'm going to allow her to continue to testify."

¶4     An economic expert also testified for Johnson. He calculated the earnings and benefits that Johnson would likely have earned over the course of her career, had the injury not occurred, to be $962,000 in future earnings and $277,879 in fringe benefits. He then reduced that number by 50% based on the vocational expert's findings that Johnson's future earning capacity had been reduced by at least half. Based on that calculation, the economic expert testified that Johnson's injuries from the accident caused her a loss of at least $619,955. Montoya objected to the economic expert's testimony, but the objection was overruled.

¶5     The jury found Montoya negligent and awarded Johnson $475,725.16 in damages. Montoya made a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Both motions were denied by the trial court. Montoya appeals.

ISSUES AND STANDARDS OF REVIEW

¶6      Montoya argues that the trial court abused its discretion when it permitted both experts to testify over her objections. A trial court's decisions about the admissibility of expert testimony are reviewed for abuse of discretion. *State v. Adams*, 2000 UT 4, ¶ 9, 5 P.3d 642.

¶7      Montoya also argues that the court improperly denied her motion for a new trial. Rule 59 of the Utah Rules of Civil Procedure gives trial courts "broad discretion to grant or deny a motion for a new trial." *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 804 (Utah 1991). A trial court's denial of such a motion will be upheld unless there "is no reasonable basis for the decision." *Id.* at 805.

ANALYSIS

I. Admission of the Expert Witness Testimony

¶8      The admissibility of expert testimony is governed by rule 702 of the Utah Rules of Evidence. Witnesses qualified as experts may testify "in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). For an expert's testimony to be admissible, there must be a "threshold showing" that the principles or methods forming the basis of the testimony (1) are "reliable," (2) are "based upon sufficient facts or data," and (3) "have been reliably applied to the facts." *Id.* R. 702(b). This "threshold showing" is met if the principles and methods used and their application to the facts of the case are "generally accepted by the relevant expert community." *Id.* R. 702(c). Trial courts perform an "important gatekeeping function" by screening out unreliable expert testimony and ensuring that "only reliable expert testimony will be presented to the jury." *Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 31, 269 P.3d 980.

To that end, trial courts are granted "broad discretion in that role," and we "will reverse [a trial court's] decision only when it exceeds the bounds of reasonability." *Id.* (citation and internal quotation marks omitted). *See State v. Maestas*, 2012 UT 46, ¶ 122, 299 P.3d 892 ("We review a trial court's decision to admit expert testimony for an abuse of discretion and find error only if no reasonable person would take the view the trial court adopted.").

¶9     Montoya challenges the trial court's decision to admit the testimony of both the vocational expert and the economic expert. She argues that the court's decision to admit the testimony of the vocational expert was an abuse of its discretion for two reasons—first, because the methods employed by the vocational expert were unreliable, and second, because the methodology was not reliably applied to the facts of the case. Montoya argues that because the testimony of the economic expert was based in part on the testimony of the vocational expert, it too was admitted in error. We address each of these arguments in turn.

A.     Reliability of the Vocational Expert's Testimony

¶10     Montoya argues that because the vocational expert "never testified that her methodology was subject to peer review, and never addressed whether there was any known potential rate of error," her methodology "lacked the foundational requirements to ensure that her opinions had a reasonable degree of certainty." Montoya, however, misstates the standard that an expert's methodology must meet for admissibility. The Utah Rules of Evidence do not require expert testimony to exhibit a "reasonable degree of certainty" to be admissible but only a "threshold showing" of reliability. Utah R. Evid. 702(b). This threshold requirement "requires only a basic foundational showing of indicia of reliability." *Id.* R. 702 advisory committee note.

¶11     Montoya specifically calls into question the reliability of the questionnaires that the vocational expert developed and used to

assess Johnson's functional limitations because no testimony was presented to show that the questionnaires were subjected to peer review or to demonstrate the questionnaires' potential rate of error. Montoya's argument overlooks the fact that the vocational expert testified that the information she gathered through the use of her own questionnaires was consistent with other evidence not challenged here, such as the medical and worker's compensation reports as well as the vocational expert's own observations of Johnson. In the context of its evaluation of the vocational expert's credentials and experience, we cannot say that the trial court exceeded "the bounds of reasonability," *see Gunn Hill*, 2012 UT App 20, ¶ 31, by determining that the questionnaires developed by the vocational expert to assess a client's functionality and the responses Johnson provided were supported by a "basic foundational showing of indicia of reliability," *see* Utah R. Evid. 702 advisory committee note, particularly when the results of the questionnaires are supported by other evidence.

¶12  Montoya also takes issue with the vocational expert's reliance on statistics gathered through the American Community Survey[1] and the Current Population Survey.[2] While she does not

---

1. Administered by the United States Census Bureau, the American Community Survey is an "ongoing survey that provides data every year" about an expansive range of topics relating to the make-up and well-being of the general population. *See American Community Survey*, United States Census Bureau, http://www.census.gov/acs/www/about_the_survey/american_community_survey/ (last visited July 29, 2013).

2. The Current Population Survey "is a monthly survey of households" administered by the United States Bureau of Labor Statistics and "provides a comprehensive body of data on the labor force, employment, unemployment, persons not in the labor force, hours of work, earnings, and other demographic and labor force characteristics." *Labor Force Statistics from the Current Population*

(continued...)

appear to challenge the reliability or validity of the two surveys themselves, Montoya essentially argues that there was an insufficient showing that the vocational expert's use of these surveys in formulating opinions is a reliable and generally accepted methodology in the field of vocational rehabilitation. We disagree.

¶13    The vocational expert testified that she knows "numerous individuals in [her] profession that use this data to help persons understand the impact of functional limitation or disability on their ability to get a job" and that these surveys are "*the* source of employment experiences of persons in the United States. There isn't any other—there's not any other source." (Emphasis in transcript.) She also testified that in addition to being the sole source of the statistics that the federal government routinely relies on, the surveys are the "primary sources that [vocational experts] use" in making determinations about "not only employment experience, but also wages and how long a person stays in the work force." We conclude that the trial court did not abuse its discretion when it admitted the vocational expert's testimony because there was a "threshold showing" that her use of the surveys as part of her methodology was reliable and generally accepted in her field. While Montoya's expert witness criticized the vocational expert's methodology as being too general and stated that he was unaware of anyone else in the field of vocational rehabilitation who uses the surveys as part of their methodology, rule 702 "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise." Utah R. Evid. 702 advisory committee note. Indeed, "[c]ontrary and inconsistent opinions may simultaneously meet the threshold; it is for the factfinder to reconcile—or choose between—the different opinions." *Id.* We conclude that the vocational expert's testimony that the surveys are used by others in her field satisfies the required "basic foundational showing of indicia of reliability." *Id.*

---

2. (...continued)
*Survey*, Bureau of Labor Statistics, http://www.bls.gov/cps/ (last visited July 29, 2013).

B.      Application to the Facts

¶14     Montoya next argues that the vocational expert "relied upon non-existent facts for her foundation when testifying that Johnson would have a shortened work life and that her lost earning capacity would be reduced by 50% to 69%." Montoya's argument centers on the fact that the vocational expert assumed and subsequently testified that Johnson would have answered "yes" to question 18b of the American Community Survey and question 4 of the Current Population Survey. The question in both surveys asks, "Does anyone have serious difficulty walking or climbing stairs?" An affirmative answer to this question would have placed Johnson within the American Community Survey's "ambulatory disability" category and would change the statistics from both surveys that would be relevant to Johnson's situation. Montoya argues that there is nothing in the record to support the vocational expert's contention that Johnson has serious difficulty going up or down stairs and, therefore, that the statistics the vocational expert considered were not reliably applied to the facts in this case.

¶15     We conclude that there is sufficient evidence in the record to support the proposition that Johnson has serious difficulty walking up and down stairs and would have so answered had questions 18b and 4 been put to her. Johnson herself testified at trial that she has "a hard time even just going up stairs by myself" and has to "calculate my steps and make sure that my foot is set so that my ankle will not roll out on my left foot." She also testified that part of her left leg is "dead numb," that she cannot play soccer with her son, and that she is no longer able to go dancing with her husband. Given Johnson's testimony, we cannot conclude that "no reasonable person would take the view the trial court adopted," *see State v. Maestas*, 2012 UT 46, ¶ 122, 299 P.3d 892, when it permitted the vocational expert's testimony, based in part on her conclusion that Johnson had serious difficulty walking up stairs, rather than striking it for lack of foundation.

¶16    Montoya also argues that the statistics relied upon by the vocational expert were too general to be reliably applied to the facts of this case because the statistics provided by the American Community Survey and Current Population Survey are calculated at a national level and include people with a large range of functional abilities and injuries. Montoya relies on then-Chief Justice Durham's opinion in *State v. Barzee*, 2007 UT 95, 177 P.3d 48, for support. In *Barzee*, the Utah Supreme Court ruled on the admissibility of expert testimony concerning whether the defendant could be restored to competency if involuntarily medicated. *Id.* ¶¶ 1, 3. Chief Justice Durham stated, "I am persuaded that the State witnesses lacked adequate foundation for their opinions in many respects, including a reliance on general statistics rather than statistics particular to the defendant." *Id.* ¶ 51 (opinion by Durham, C.J.). She also stated, "I am not persuaded that the rates of restoration for the general population at the state hospital would have any bearing on [the defendant's] particular case without any showing that the population resembled [the defendant]." *Id.* ¶ 53. Although Chief Justice Durham's statements were made in a part of her lead opinion that did not enjoy majority support, they cannot, on that basis alone, be summarily dismissed. A majority of justices in *Barzee* apparently agreed that general statistics cannot be used in isolation and without regard to information specific to the relevant individual. *See id.* ¶¶ 91–93 (opinion by Durrant, J.). The majority did conclude, however, that because the State's experts used general statistics in combination with their own first-hand knowledge to support their conclusions, the testimony was admissible. *Id.* ¶ 92 ("Futhermore, we conclude that the State's experts did not disregard [the defendant's] particular case, although it is true that they relied on federal and state statistics taken from general hospital populations."). We believe the same analysis applies here.

¶17    While statistics more narrowly tailored to Johnson's specific field of work, capabilities, location, injuries, and functional limitations may have made the vocational expert's testimony all the more reliable, we conclude that the trial court did not abuse its

discretion when it permitted testimony based only in part on general statistics from the American Community Survey and Current Population Survey. The vocational expert testified that she came to her conclusions after relying on her own assessment of Johnson, Johnson's medical records, accident reports, worker's compensation records, and multiple sources of employment data and demographic information of which the American Community Survey and Current Population Survey, while certainly key pieces of her methodology, were just two. When asked about her reliance on the surveys, the vocational expert testified:

> I also am looking at the individual to see what she's doing. We can't just use broad statistics to say what's going to happen, you know? That's why we do a vocational assessment; we look at every—every aspect of an individual and then determine what impact this particular limitation has on the individual.

When asked on cross-examination if the statistics related to the employability of persons with disabilities, including disabilities as severely limiting as quadriplegia, were actually relevant to assessing the employability of a person in Johnson's situation, the vocational expert responded:

> First of all, I did not lump her in with those kinds of persons because . . . based on the criteria, she is an individual with a non-severe work disability. These folks that you're talking about have . . . a severe disability and would be highly unlikely to even be working. . . . Secondly, my profession is not a science like engineering, and there are human factors that we take into consideration, which I did in this particular case.

The vocational expert further testified that "[b]ecause the American Community Survey tracks labor force participation of

individual[s of] various ages, various educational achievements," and because "it shows us that persons that have different functional limitations have a different experience in the labor force," it is a resource for determining what type of future employment experience Johnson might be likely to have. She explained, "[T]his is why we look at things in terms of a range. We can't just pinpoint and say this is exactly where she is. But it helps us understand what the changes are in a person's ability to participate in the labor force." We conclude that the vocational expert did not rely on general statistics in isolation, and thus, that the trial court did not abuse its discretion in finding that there were sufficient "indicia of reliability" to make a threshold showing that the expert's methodology was reliably applied to the facts. *See* Utah R. Evid. 702 advisory committee note.

C.     The Economic Expert

¶18     Montoya argues that the economic expert's testimony was also admitted in error because it was based in part on the conclusions of the vocational expert. Because we determine that the vocational expert's testimony was admissible and no other challenge has been made to the economic expert's testimony, we conclude that the trial court did not abuse its discretion when it admitted this testimony as well.

## II. Motion for New Trial

¶19     Rule 59 of the Utah Rules of Civil Procedure grants the trial court discretion to grant or deny a motion for a new trial. Utah R. Civ. P. 59(a). Montoya argues that the trial court erred when it denied her motion for a new trial because there was no evidentiary support for the jury's verdict. *See id.* R. 59(a)(6). Montoya's argument rests on her claim that the testimony of both experts should have been excluded. Having determined that the testimony of both experts was admissible, we conclude that the trial court had a reasonable basis for denying the motion for a new trial.

CONCLUSION

¶20    The trial court did not exceed the bounds of reasonability when it determined that there was a sufficient threshold showing that the vocational expert's testimony was both based on reliable methodology and reliably applied to the facts. *See* Utah R. Evid. 702(b)–(c). Because the vocational expert's testimony was admissible, the trial court's decision to admit the economic expert's testimony was also not an abuse of discretion. Having determined that neither experts' testimony was improperly admitted, we also conclude that the trial court had a reasonable basis for denying Montoya's motion for a new trial.

————