**2019 UT App 107**

## THE UTAH COURT OF APPEALS

CHERYL SPRAGUE,
Appellee,
*v.*
AVALON CARE CENTER,
Appellant.

Opinion
No. 20180019-CA
Filed June 20, 2019

Third District Court, Salt Lake Department
The Honorable Barry G. Lawrence
No. 140908104

Catherine M. Larson and Jennifer R. Carrizal,
Attorneys for Appellant

Karra J. Porter and Kristen C. Kiburtz, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and KATE APPLEBY
concurred.

MORTENSEN, Judge:

¶1      After a six-day trial, which included testimony from
seventeen witnesses—almost half of whom were experts—a
nearly unanimous jury[1] awarded Cheryl Sprague, individually
and on behalf of the heirs and estate of Morley Reed Sprague
(collectively, Sprague), a $2 million verdict against Avalon Care
Center (Avalon) for Sprague's injuries and resulting wrongful

---

1. Although eight of eight jurors found that Avalon breached the
applicable standard of care, only seven found that Avalon's
breach was the proximate cause of Sprague's death.

death. Avalon appeals, arguing that the trial court erred by denying its motion for partial directed verdict and admitting various expert testimony. We affirm.

## BACKGROUND[2]

¶2 Morley Sprague was an elderly man who suffered from advanced multiple sclerosis (M.S.) and paralysis of his lower extremities. As a result, he was confined to a bed or wheelchair and was "unable to reposition himself while sitting or lying down." This placed Sprague "at serious risk for developing pressure ulcers."[3]

¶3 In 2012, Sprague was admitted to Avalon, where he stayed for twenty-nine days. When he arrived, Sprague suffered

---

2. "Our recitation of the facts is presented in the light most favorable to the jury's verdict, and comes from the testimony and evidence developed at trial." *Utah Dep't of Transp. v. Target Corp.*, 2018 UT App 24, ¶ 3 n.2, 414 P.3d 1080, *cert. granted*, 425 P.3d 800 (Utah 2018).

3. Bedsores—also called pressure ulcers and decubitus ulcers—
> are injuries to skin and underlying tissue resulting from prolonged pressure on the skin. Bedsores most often develop on skin that covers bony areas of the body, such as the heels, ankles, hips and tailbone. People most at risk of bedsores are those with a medical condition that limits their ability to change positions or those who spend most of their time in a bed or chair. Bedsores can develop quickly. Most sores heal with treatment, but some never heal completely.

*Bedsores (pressure ulcers)*, Mayo Clinic (March 9, 2018), https://www.mayoclinic.org/diseases-conditions/bed-sores/symptoms-causes/syc-20355893 [https://perma.cc/28QD-8BM5].

from "a small, stage [one] pressure ulcer on his right buttock."[4] Avalon assigned Sprague a doctor, Scott E. Southworth; a wound care nurse, Richard Fonoti; and other nurses and nurses' aides. Southworth relied on Fonoti and the other nurses to keep him informed about Sprague's condition, particularly the pressure ulcer.

¶4      Within one month of being admitted to Avalon, Sprague's stage one pressure ulcer "had significantly deteriorated—to the point where bone was exposed—and had become infected." Sprague's family removed him from Avalon, but he never fully recovered. Over the next twenty-two months, attempts to treat the wound with surgery and antibiotics were unsuccessful and Sprague died. His heirs and estate subsequently filed this medical malpractice and wrongful death action.

*Denial of the Partial Directed Verdict*

¶5      At trial, Sprague called expert witness Kevin Emmons—a board certified wound care nurse and professor of nursing at Rutgers University—to testify to the standard of care of a wound care nurse. On direct examination, Sprague's counsel asked,

> Based on the materials that you have reviewed, and your understanding of wound care, have you formulated any opinions to a reasonable degree of medical probability with regard to what the standard of care, or what the standard of care would have been required of [Avalon] in treating [Sprague's] wounds?

---

4. Bedsores are divided into four stages, one being the least severe to four being the most severe. *Bedsores*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/bedsores [https://perma.cc/D2LN-RHUK].

Emmons answered, "Sure," then expressed and explained those opinions.

¶6 Emmons opined that Avalon breached the minimum standards of care in the following seven respects: (1) inadequate turning of Sprague, (2) failure to minimize wheelchair time, (3) failure to provide a ROHO cushion,[5] (4) failure to provide an air mattress sooner, (5) failure to provide qualified staff, (6) failure to refer Sprague to a specialist, and (7) failure to properly involve Sprague's family in his care. Emmons elaborated on each point by citing medical records, deposition testimony, and other factual bases for his opinions. Emmons "vigorously defended these opinions on cross-examination."

¶7 At the conclusion of Sprague's case-in-chief, Avalon moved for a partial directed verdict on five of the seven alleged

---

5. A ROHO cushion is

> designed to reduce pressure sore (ischemic ulcer) formation. The cushion uses air-fluid interconnected cells to mimic the supportive properties of water and reduce the incidence of pressure sores. The technology employs four key principles to achieve this end: six degrees of freedom (cells are independent and can adapt to the anatomy of the patient), low surface tension (permits immersion into the cushion without deforming tissue), constant restoring force (forces and pressures pushing back against the patient are kept constant at all points of contact), and low friction and shear (the slick surface prevents friction between the cushion and the patient's skin).

J.C. Oleson, *The Punitive Coma*, 90 Cal. L. Rev. 829, 868 n.219 (2002).

breaches.[6] Avalon argued that Emmons's testimony had not established each alleged breach of the standard of care to a reasonable degree of medical probability. The trial court denied the motion. The court agreed that it was Sprague's burden to prove the elements to a reasonable degree of medical probability but that "Emmons's testimony either explicitly or implicitly met that standard based on its totality."

*Expert Witness Testimony[7]*

¶8    Sprague's counsel elicited extensive testimony from Southworth—Sprague's treating physician at Avalon—on direct examination. Among other things, Southworth answered questions related to the seven alleged duties and breaches discussed by Emmons. During this line of questioning, Southworth was asked, "So these seven [duties and breaches], you would agree, are basic standards of care for treating patients, such as [Sprague], that have existing pressure ulcers[?]" Avalon objected on the ground that Southworth was not a nurse and therefore could not provide expert testimony on the standard of care of nurses. The court partially sustained the objection and provided the following jury instruction:

> So I'm going to allow him to answer the question, but I want to explain something to the jury. You're going to be asked to make determinations as to the nursing standard of care in this case. Dr. Southworth is not a nurse, okay? I'm going to

6. Avalon concedes that the standard of care and breach were sufficient to support a prima facie case with respect to Avalon's failure to provide a ROHO cushion and its failure to involve Sprague's family in his ongoing care.

7. We recite the following expert witness testimony in the same order as the issues have been presented on appeal rather than the order in which the witnesses actually testified at trial.

> allow him to answer these questions for the limited purpose of answering the question as far as his knowledge as a doctor about wound care. But as I said, later in the case you're going to hear from experts who are going to talk about nursing standard of care, and that is what is applicable in this case.

Southworth then answered, "These are things that I, as a physician, would expect."

¶9     A key witness for Avalon was Dr. Kwon Lee—a certified wound care physician—who testified that the development and progression of Sprague's pressure ulcers were "unavoidable." Lee testified that he had reviewed "a lot" of Sprague's records, including records before, during, and after Sprague's stay at Avalon. Lee also reviewed the depositions of Fonoti and other nurses, Sprague's experts, Sprague's wife, and Sprague's treating physicians. With that preface, Avalon asked Lee if he had formed opinions in the case and what those opinions were. Lee responded, "The care at [Avalon], I believe was reasonable. . . . And the care rendered by [Fonoti] was appropriate."

¶10     Lee elaborated on general nursing standards of care in response to being asked what other interventions could have been made to prevent a pressure ulcer. Specifically, he offered that "certainly turning and repositioning is really the standard. Using pressure reducing mattresses and so forth, cushions . . . . [I]f there's skin that's prone to moisture, you want to use like a barrier cream, like a thick type of ointment . . . . And there are dressings that you can use, like foam dressings that will actually help provide some pressure relief."

¶11     Next, Lee gave opinions about the standard of care expected of Fonoti. Lee stated that Fonoti had an obligation as a wound care nurse to supervise other nurses and to ensure appropriate preventative measures were in place. He further opined that Fonoti had not caused the development of, or any

additional injury to, Sprague's pressure ulcer. Finally, Lee testified that Avalon could not have implemented other interventions that would have helped to avoid Sprague's pressure ulcer.

¶12    On cross-examination, Sprague's counsel first confirmed Lee's testimony on the general nursing standards of care. As a result, Lee began backtracking on his earlier testimony by characterizing certain actions as "recommendations" rather than "standards" as he had previously stated. When Sprague's counsel pressed the issue, Avalon objected, claiming the cross-examination was beyond the scope of the direct examination. Avalon argued that Sprague's questions went to general nursing standards of care, whereas questions to Lee on direct had been limited to the standard of care as to just Fonoti. The trial court overruled the objection because Avalon "asked some really broad standard of care questions" on direct examination. Sprague continued attempting to discredit Lee, and Avalon again objected to the questioning as beyond the scope of direct examination. Again, the court overruled the objection and acknowledged that the purpose of the questions was to impeach Lee on his earlier testimony.

¶13    Sprague then attempted to impeach Lee on his position that no other mitigating measures could have been taken to prevent the pressure ulcer. Avalon again objected, arguing that it "had limited [Lee's] testimony to [Fonoti]" and that questions about the other attending nurses were therefore beyond the scope of the initial examination. The trial court again overruled this objection because Lee had testified broadly on direct examination, effectively opening the door to the line of questions related to the nurses working under Fonoti's supervision.

¶14    Next, the trial court admitted Emmons's testimony related to Sprague's alleged medical expenses. Emmons's transcribed testimony, in total, covered nearly 200 pages in the record. In addition to testifying about his professional expertise

and experience, Emmons testified that he reviewed "a few thousand records" related to this case. Those records included (1) documents arising from Sprague's initial hospitalization, his first long-term care, his second long-term care, his stay at Avalon, his hospice stay, and his discharge to home care; (2) Sprague's death certification; (3) depositions of the nurses, physicians, and Avalon's experts; and (4) Sprague's medical bills, for which Emmons provided a summarized report (Summary).

¶15 On voir dire,[8] Avalon suggested that Emmons had not personally reviewed all the documents listed in the Summary because he had not also listed each provider separately, and by name, in his expert report. Emmons disagreed and explained that when a facility orders a medical service it may not always perform that service; but, that the reports, bills, and other documents related to that service remain within the ordering facility's records. So rather than list each individual provider who performed a service, Emmons's expert report simply identified the facility that ordered the service. Counsel for Avalon then stated, "I've made my point. I would move to just strike the portions of the [S]ummary that refer to those providers of whose records were not identified in the [expert] report." The trial court then asked Avalon, "Okay. Were you provided those records in the course of this case?" Avalon responded, "I have the records. Yes." The trial court conditionally admitted the Summary but indicated it would revisit the issue "at the next break."

¶16 At the next recess, Avalon again acknowledged it had received all the relevant medical bills at issue. The trial court asked if Avalon had "a good faith basis to believe that any of these dollar signs on this [S]ummary don't meet up with the real

---

8. In this context, voir dire is a "preliminary examination to test the competence of a witness." *Voir dire*, Black's Law Dictionary (10th ed. 2014).

bill?" Avalon admitted, "No. They meet up with the bill." The court indicated that it believed Avalon's contentions with the medical bills were related to causation, not their admissibility. Avalon's counsel responded, "What my point was, was there are bills in there that are costs for care that's not related to the pressure ulcer." The court advised counsel that "there's certainly nothing preventing you, in your case, from having a witness tell that to a jury." The court ruled that the Summary was admissible and advised Avalon that if it wanted to respond to the causation components of the medical bills, it "certainly [could]." The court further instructed, "I want [Avalon] to provide to [Sprague] a list of the items that [it] think[s] are not [medical costs related to causation] by Monday morning." Avalon's counsel suggested, "[J]ust as another alternative, there's nothing precluding me from just raising this issue in closing?" The court responded, "[I]f you'd rather go that way, that's fine. By admitting [the Summary], I'm certainly not foreclosing you the opportunity to argue that some of those costs were not causally related." Avalon answered, "Right. Okay. Fair enough."

¶17   Sprague also called Dr. Mary Parsons who testified about Sprague's cause of death. During Parsons's testimony, Sprague's death certificate—which she had completed and signed—was also admitted into evidence. Parsons testified to, among other things, her general training and experience concerning (1) treating patients with pressure ulcers; (2) interpreting symptoms of M.S.; (3) treating Sprague as his primary care physician for "15 to 16 years"; (4) reviewing Sprague's medical records from before, during, and after the time he was a patient at Avalon; (5) completing death certificates generally, and for Sprague; (6) consulting with Sprague's other doctors and nurses about his ailments, treatments, and cause of death; and (7) consulting with Sprague's family about his ailments, treatments, and cause of death.

¶18   Next, Parsons testified that Sprague's cause of death—as she had indicated on the death certificate—was the pressure ulcer. Avalon objected, stating, "I'll just renew our prior

objection that we've made previously." Counsel for each party approached the bench, and the court indicated that it was concerned whether a "reasonable certainty of preponderance [was] entered." Sprague's counsel offered to cure this objection by saying, "I can ask her." The court responded, "[W]hy don't you." When direct examination resumed, Sprague's counsel asked Parsons, "[S]o would you be comfortable saying that what you put on the death certificate is the cause of death to a reasonable degree of medical probability?" Parsons answered, "Yes." The court then admitted the death certificate without objection.

¶19   Dr. David Pegues also testified to Sprague's cause of death. In over seventy pages of testimony, much of which laid the foundation of Pegues's experience and personal knowledge of Sprague's medical records, Pegues opined on Sprague's cause of death, without objection by Avalon. When Sprague's counsel asked Pegues, "[H]ave you formed an opinion to a reasonable degree of medical probability as to what caused [Sprague's] death?" Pegues answered, "[T]he most likely cause of death, was related to the presence of and complications of the . . . ulcer that had then been present for 20 months." Pegues later testified—again without objection—that although it was possible that another ailment such as a urinary tract infection, pneumonia, or influenza could have been the cause of death, "the available medical documentation does not support [any of those] as the probable cause of death."

¶20   After a six-day trial, the jury found Avalon liable and awarded $2 million in damages. Avalon appeals.


ISSUES AND STANDARDS OF REVIEW

¶21   First, Avalon contends that its motion for partial directed verdict was denied in error. "The grant or denial of a directed verdict is . . . a question of law reviewed for correctness." *Liley v. Cedar Springs Ranch Inc.*, 2017 UT App 166, ¶ 12, 405 P.3d 817.

And when, as is the case here, "an appellant challenges the denial of a motion for a directed verdict based on the sufficiency of the evidence, the applicable standard of review is highly deferential." *Id.* (cleaned up).

¶22    Second, Avalon contends that the trial court erred by admitting testimony from the following experts: Southworth, Lee, Emmons, Parsons,[9] and Pegues. "We review the trial court's decisions regarding the admission of expert witness testimony for an abuse of discretion." *Balderas v. Starks*, 2006 UT App 218, ¶ 13, 138 P.3d 75.


ANALYSIS

I. Directed Verdict

¶23    Avalon contends that its motion for partial directed verdict should have been granted because Sprague failed to establish that Avalon breached the standard of care as to five of the seven standards identified by Emmons. Avalon specifically argues that because Emmons did not expressly state his opinions in terms of "a reasonable degree of medical probability," Sprague failed to establish a prima facie case. But as discussed below, Utah law does not require that an expert witness expressly invoke that phrase separately and repeatedly in conjunction with each stated opinion, and therefore, we disagree.

---

9. Avalon also contends that Sprague's death certificate—which was signed by Parsons—was erroneously admitted "because it sets forth an opinion as to [Sprague's] cause of death that does not meet [rule] 702's requirements for expert causation testimony." Because this is the same argument against Parsons's expert testimony in general, and because the death certificate is cumulative evidence of Parsons's testimony, we address these points together. *Infra* ¶¶ 44–47.

¶24 "To establish medical malpractice, a plaintiff must prove four elements: (1) the standard of care required of health care providers under the circumstances; (2) breach of that standard by the defendant; (3) injury proximately caused by the breach; and (4) damages." *Morgan v. Intermountain Health Care, Inc.*, 2011 UT App 253, ¶ 8, 263 P.3d 405. Owing to the complex nature of medical malpractice cases, plaintiffs generally must establish the standard of care and proximate cause elements through expert testimony. *Dalley v. Utah Valley Reg'l Med. Center*, 791 P.2d 193, 195–96 (Utah 1990); *see also Chadwick v. Nielsen*, 763 P.2d 817, 821 (Utah Ct. App. 1988) ("Due to the technical and complex nature of a medical doctor's services, expert medical testimony must be presented at trial in order to establish the standard of care and proximate cause . . . .").

¶25 Our supreme court, in *State v. Jarrell*, 608 P.2d 218 (Utah 1980), summarized the standard required of medical experts as follows:

> The general rule regarding the certainty of an expert's opinion is that the expert may not give an opinion which represents a mere guess, speculation, or conjecture. Expert medical opinion evidence based on a probability, possibility, or likelihood has been admitted, however, where the witnesses expressed statements in language which sufficiently represented their own best judgment to a reasonable certainty.

*Id.* at 230 (cleaned up). This rule does not require that an expert expressly state the phrase, "to a reasonable degree of medical probability" for their testimony to be admissible or entitled to weight. Indeed, consistent with the trial court's approach here, expert testimony should be viewed as a whole and analyzed on its substance. *See, e.g., Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 17, 339 P.3d 624 ("When the report is read as a whole, and in light of th[e] clear statement that [the claimant] has the

[relevant] medical conditions, it is evident that the medical panel's opinion is based on the panel's assessment of medical probability." (cleaned up)); *Johnson v. Montoya*, 2013 UT App 199, ¶ 10, 308 P.3d 566 ("The Utah Rules of Evidence do not require expert testimony to exhibit a reasonable degree of certainty to be admissible but only a threshold showing of reliability. This threshold requirement requires only a basic foundational showing of indicia of reliability." (cleaned up)).

¶26    Here, Emmons's expert testimony was sufficiently reliable to establish the prima facie elements of medical malpractice and to survive Avalon's motion for directed verdict. During his direct examination, Sprague's counsel asked,

> Based on the materials that you have reviewed, and your understanding of wound care, have you formulated any opinions to a reasonable degree of medical probability with regard to what the standard of care, or what the standard of care would have been required of [Avalon] in treating [Sprague's] wounds?

Emmons answered, "Sure," and then expressed and explained those opinions. The fact that Emmons did not repeat the phrase "to a reasonable degree of medical probability" each time he stated an opinion is neither here nor there. The question is whether Emmons expressed his opinions in a way that indicated sufficient certainty. Besides the alleged shortcoming of not attaching the incantation of "a reasonable degree of medical probability," the record gives no indication that Emmons's opinions were offered under a different standard than the one with which he prefaced his entire testimony. Avalon argues that because Emmons failed to separately qualify each of his opinions, we cannot know what standard he was applying. We disagree that his testimony, when reviewed as a whole, was compartmentalized in the manner Avalon suggests. And Avalon does not point to any portion of the record that would lead us to

conclude that Emmons changed the general qualification that his opinions were formulated to a reasonable degree of medical probability.

¶27   We see no basis to disagree with the trial court's conclusion that Emmons's opinions concerning all seven alleged breaches were offered—either expressly or impliedly—to a reasonable degree of medical certainty. *See Liley v. Cedar Springs Ranch Inc.*, 2017 UT App 166, ¶ 12, 405 P.3d 817 (stating that when a challenge to the denial of a directed verdict concerns the sufficiency of the evidence presented below, appellate review is "highly deferential" to the trial court's findings (cleaned up)). We conclude that Emmons's testimony, as a whole, displayed the requisite indicia of reliability required to be admissible, and therefore, the directed verdict was properly denied.

## II. Expert Testimony

¶28   Next, Avalon contends that the trial court abused its discretion in admitting expert testimony from five witnesses. We discuss each witness in turn. *Utah Dep't of Transp. v. TBT Prop. Mgmt., Inc.*, 2015 UT App 211, ¶ 15, 357 P.3d 1032 ("The proper scope of cross-examination is within the sound discretion of the trial court and should not be disturbed absent a showing of abuse [of discretion]." (cleaned up)).

### A.    Southworth

¶29   Avalon argues that the trial court erred in allowing Southworth to testify to the standard of care for nurses, because he is not a nurse. "In Utah, a practitioner of one school of medicine is ordinarily not competent to testify as an expert in a malpractice action against a practitioner of another school due to the wide variation between schools in both precepts and practices." *De Adder v. Intermountain Healthcare, Inc.*, 2013 UT App 173, ¶ 16, 308 P.3d 543 (cleaned up) (holding that "a doctor's training as a physician is not sufficient by itself to qualify him or her to testify as an expert in a malpractice action

against a nurse" (cleaned up)). An exception to this rule is when an expert "is knowledgeable about the applicable standard of care." *Id.* ¶ 17 (cleaned up); *see, e.g.*, *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 692–93 (4th Cir. 2011) (discerning no abuse of discretion where the doctor, who testified about the nursing standard of care, "regularly perform[ed] the procedure at issue . . . and the standard of care for performing the procedure is the same" for doctors and nurses (cleaned up)).

¶30 Avalon argues that the trial court erred by overruling its objection and admitting Southworth's "extensive" opinions on the nursing standard of care. But that is not what happened here. Avalon ignores that its objection to Southworth's testimony was partially sustained and that the court gave a curative instruction—it told the jury to consider Southworth's testimony only for the "limited purpose of . . . his knowledge as a doctor about wound care." This instruction properly informed the jury that Southworth was permitted to testify to the standard of care only as it pertained to his knowledge as a physician, not as a nurse. *See De Adder*, 2013 UT App 173, ¶ 17 (permitting expert testimony to the extent that an expert "is knowledgeable about the applicable standard of care" (cleaned up)). In other words, because Southworth's testimony was limited to his knowledge as a physician on the standard of care owed by Avalon, it was properly admitted. And to the extent that Avalon believed that this testimony was not relevant to the standard of care for nurses, it could have, and should have, made that argument to the jury. Therefore, we conclude that the trial court did not err in admitting Southworth's testimony.

¶31 Further, Avalon's opening brief did not include any analysis, discussion, or even a mention of how admitting Southworth's testimony was prejudicial. *See Camco Constr. Inc. v. Utah Baseball Academy Inc.*, 2018 UT App 78, ¶ 42 n.13, 424 P.3d 1154 ("Issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." (cleaned up)). Indeed, even in its reply brief, Avalon only dedicates a single

sentence to prejudice: "Moreover, allowing such testimony was highly prejudicial and substantially affecting the likelihood of a different result." This conclusory sentence falls well short of showing a reasonable likelihood that the verdict would have been different if Southworth's testimony had been excluded. *See Campbell v. State Farm Mutual Auto. Ins. Co.*, 2001 UT 89, ¶ 13, 65 P.3d 1134 ("A trial court will not be reversed for an abuse of discretion unless there is a reasonable likelihood that the verdict would have been different if the trial court had excluded the expert testimony." (cleaned up)), *rev'd on other grounds*, 538 U.S. 408 (2003). Thus, even if we were persuaded that the court abused its discretion, Avalon has not shown that the error was prejudicial.

B.      Cross-Examination of Lee

¶32    We next turn to the issue of the scope of Lee's cross-examination. Lee testified on direct examination to the standards of care for treating a patient such as Sprague. Specifically, he discussed the general nursing standards of care for treating bedsores and the specific standards of care applicable to Fonoti. On cross-examination, the court permitted Sprague's counsel to ask questions regarding the general nursing standards of care and, importantly, to impeach Lee as he was backtracking on his earlier testimony by phrasing certain actions as "recommendations" rather than "standards." Avalon argues that this testimony was beyond the scope of direct examination because Lee "was designated by [Avalon] in the limited capacity of offering testimony of causation, damages, and the standard of care of [Avalon's] wound care nurse, [Fonoti], . . . which differs from the standard of care applicable to [Avalon's] general nursing staff." We disagree.

¶33    The Utah Rules of Evidence provide that "[c]ross-examination should be limited to" (1) "the subject matter of the direct examination" and (2) "matters affecting the witness's credibility." Utah R. Evid. 611(b). In other words, under rule 611(b), a trial court has broad discretion to permit a party, on

cross-examination, to ask questions related to the subject matter of direct examination or to impeach the witness. *Id.*; *see also Whitehead v. American Motors Sales Corp.*, 801 P.2d 920, 924 (Utah 1990) ("Having offered his expert opinion, the witness exposes himself to interrogation which ordinarily would have no place in the cross-examination of a factual witness, but the expert exposes himself to the most searching kind of investigation into his qualifications, the extent of his knowledge and the reasons for his opinion, including the facts and other matters upon which it is based." (cleaned up)); *Utah Dep't of Transp. v. 6200 S. Assocs.*, 872 P.2d 462, 469 (Utah Ct. App. 1994) ("The scope of the cross-examination of experts . . . is very broad, since cross-examination is often the only protection of the opposing party against the unwarranted estimates that a certain class of mercenary experts is wont to indulge in." (cleaned up)).

¶34　Here, we conclude that the trial court did not abuse its discretion in permitting Sprague to continue to cross-examine Lee. First, Lee testified on direct-examination about standards of care in general, and as applied to Avalon, Avalon's nursing staff, and Fonoti. Therefore, on cross-examination, Sprague was properly permitted to ask questions on this same subject matter. Second, Sprague was permitted to impeach Lee. Avalon's contention that Sprague was not permitted to highlight that Lee was backtracking on his earlier testimony by phrasing certain actions as "recommendations" rather than "standards"—as he had previously stated—is legally incorrect. We therefore conclude that the trial court did not abuse its discretion in admitting Lee's testimony from cross-examination.

¶35　Further, Avalon's opening brief again does not demonstrate how admitting Lee's testimony was prejudicial. *See Camco*, 2018 UT App 78, ¶ 42 n.13. And again, in its reply brief, Avalon dedicates only a single sentence to prejudice: "[T]he prejudice of [admitting Lee's testimony] is clear as there was a substantial likelihood of a different result." Thus, even if we

were persuaded by Avalon on this alleged error, we would still be compelled to affirm. *See Campbell*, 2001 UT 89, ¶ 13 (requiring a showing of prejudice to warrant reversal), *rev'd on other grounds*, 538 U.S. 408 (2003).

C.     Emmons—Medical Expenses

¶36     Avalon's next contention is that the trial court erred in admitting Emmons's testimony and related Summary concerning Sprague's medical bills. Specifically, Avalon argues that Emmons's testimony and Summary were deficient under rule 703 of the Utah Rules of Evidence and that Emmons's testimony and Summary were improperly admitted because his expert report was deficient under rule 26(a)(4)(B) of the Utah Rules of Civil Procedure.[10]

1.     Utah Rule of Evidence 703

¶37     The Utah Rules of Evidence provide, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Utah R. Evid. 703; *see also State v. Kelley*, 2000 UT 41, ¶ 18, 1 P.3d 546 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." (cleaned up)). Here, the record indicates that Emmons's testimony and Summary

---

10. Avalon also contends that Emmons's testimony should have been excluded under rule 702 of the Utah Rules of Evidence. Avalon, however, never made a rule 702 objection at trial, and therefore this issue is not preserved, and we decline to address it. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 ("When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation.").

satisfied rule 703 because he personally reviewed the medical bills at issue.[11]

¶38    Avalon contends that Emmons did not have personal knowledge of each of Sprague's medical bills that were listed in the Summary because his expert report did not list each provider who generated a medical bill. The record shows otherwise. When Avalon questioned Emmons about his knowledge of the medical bills, he provided a succinct explanation: that he had indeed reviewed each medical bill, but for clarity, had limited references in his expert report to the ordering facility, rather than listing each discrete provider separately. Emmons explained that when a provider performs a service, all records related to that service are retained by that provider and the facility that ordered the service. Thus, on Emmons's expert report, certain facilities were referenced in connection with medical records and services it may have ordered but not actually performed. In other words, Emmons's testimony demonstrates that he did review each of Sprague's medical bills despite the fact that he may have listed only the ordering facility and not the provider who actually performed that service.

¶39    Furthermore, Avalon cannot show prejudice. When the trial court asked Avalon if it had "a good faith basis to believe that any of these dollar signs on this [S]ummary don't meet up with the real bill," Avalon conceded, "No. They meet up with the bill." Accordingly, where Avalon concedes that the figures in the Summary are accurate, we conclude that the trial court did not err in admitting Emmons's testimony or Summary under rule 703.

---

11. Other than an argument that Emmons had not personally reviewed or was otherwise made aware of particular expenses, Avalon argues no other basis for exclusion under rule 703 on appeal.

2.      Disclosure Under Rule 26(a)(4)(B)

¶40    Avalon also argues that the trial court erred "in admitting [Sprague's] medical expense summary chart into evidence . . . because [Sprague] did not comply with the disclosure requirements of Utah Rule of Civil Procedure 26." Avalon contends that Emmons's expert report was deficient under rule 26(a)(4)(B) because it "did not state that he reviewed the medical expense documentation relating to [various providers], all of which formed much of the medical expense summary." Avalon's contention is unavailing for three reasons.

¶41    First, Avalon abandoned its rule 26 disclosure objection at trial, and therefore the issue is not preserved for appeal. *See State v. McNeil*, 2013 UT App 134, ¶ 23, 302 P.3d 844 ("A claim is not preserved for appeal if a party initially objects but later . . . abandons the objection and stipulates to the court's intended action."), *aff'd on other grounds*, 2016 UT 3, 365 P.3d 699. Avalon initially objected and moved the court to "strike the portions of the [S]ummary that refer to those providers whose records were not identified in the report." But Avalon abandoned this objection when it conceded that Sprague had disclosed all of the medical records, the medical records were accurate, and the point it intended to make to the court was that there "are costs for care that are not related to the pressure ulcer" contained in the Summary. Then, after Avalon conceded to the trial court that its objection concerned causation rather than admissibility, it did not pursue its original disclosure objection. Accordingly, Avalon abandoned its disclosure objection, and it is therefore not preserved for appeal. *See ConocoPhillips Co. v. Utah Dep't of Transp.*, 2017 UT App 68, ¶ 26, 397 P.3d 772 ("Defendants affirmatively represent[ing] to the court that they no longer sought a curative instruction . . . in conjunction with [d]efendants' counsel's simultaneous proposal of an alternative remedy that did not involve a curative instruction, constituted a waiver."). Under such circumstances, we cannot conclude that the trial court abused its discretion in allowing the Summary into evidence.

¶42 Second, and in the same vein, Avalon invited any perceived error concerning the trial court's decision to admit Emmons's testimony and Summary. *See State v. Winfield*, 2006 UT 4, ¶ 15, 128 P.3d 1171 ("Invited error . . . arises from the principle that a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." (cleaned up)). Although Avalon made its initial objection on the ground that Sprague's expert disclosures were deficient, it later conceded that its concern went to causation, not admissibility. And when the court offered to ameliorate these concerns by allowing Avalon's expert to opine on whether the medical bills related to causation, Avalon instead asked if it could rebut Emmons's testimony and Summary in its closing argument. The court responded, "[I]f you'd rather go that way, that's fine. By admitting [the Summary], I'm certainly not foreclosing you the opportunity to argue that some of those costs were not causally related." Avalon answered, "Right. Okay. Fair enough." Avalon thereafter did not raise similar concerns with the trial court, nor has it argued on appeal that it did. Accordingly, we conclude that Avalon invited any perceived error by signaling to the trial court that concerns over Emmons's testimony and Summary were cured by allowing Avalon to rebut that testimony in closing arguments and not thereafter renewing its disclosure objection. In short, the court gave Avalon the remedy it asked for.

¶43 Third, Avalon has not argued that it was prejudiced by the admission of Emmons's testimony or Summary, nor, in our view, can prejudice be found on these facts. *See Campbell*, 2001 UT 89, ¶ 13 (requiring a showing of prejudice to warrant reversal), *rev'd on other grounds*, 538 U.S. 408 (2003).

D.    Parsons

¶44 Avalon, in its opening brief, contends that the trial court abused its discretion by "allow[ing] [Parsons] to offer opinions about the cause of [Sprague's] death" and admitting Sprague's death certificate. Avalon argues that Parsons failed to "meet a

threshold showing of reliability" to testify to Sprague's cause of death and that her testimony and the death certificate were therefore admitted in error.

¶45 We reject Avalon's position for three reasons. First, Parsons's foundational testimony satisfied rules 702 and 703 of the Utah Rules of Evidence. Specifically, Parsons testified that she had extensive experience as a treating physician and had specifically treated patients with pressure ulcers. Parsons also testified that she had extensive experience and history with Sprague; she had consulted with Sprague's family and medical care providers; and she had reviewed all of the relevant medical records in this case. Thus, we conclude that Parsons's testimony established a basic "foundational showing of indicia of reliability" and therefore, the trial court did not abuse its discretion in admitting her testimony. *See Johnson v. Montoya*, 2013 UT App 199, ¶ 10, 308 P.3d 566 ("The Utah Rules of Evidence . . . require[] only a basic foundational showing of indicia of reliability." (cleaned up)).

¶46 Second, although Avalon has argued that Parsons's testimony was not sufficiently reliable, it has failed to directly point to specific objections or "engage with" the trial court's specific rulings on those objections sufficient to satisfy its burden on appeal. *See Gines v. Edwards*, 2017 UT App 47, ¶ 31, 397 P.3d 612 (explaining that "the appellant must engage with and challenge the actual bases of the [trial] court's decisions" to persuade a reviewing court on appeal (cleaned up)). For example, Avalon's opening brief points out various criticisms of Parsons, including that "[h]er clinical practice does not include the management of [M.S.]" and that "Parsons has only treated a few patients with advanced [M.S.] like [Sprague]." These critiques, however, go only to the weight of the testimony offered by Parsons, *see Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 45, 269 P.3d 980, not the indicia of reliability required for admissible expert testimony, *see Johnson*, 2013 UT App 199, ¶ 10.

¶47    Third, Avalon has not explained why any alleged error on this issue was prejudicial. *See Campbell*, 2001 UT 89, ¶ 13 (requiring a showing of prejudice to warrant reversal), *rev'd on other grounds*, 538 U.S. 408 (2003). Therefore, we conclude that the trial court did not err in admitting Parsons's testimony.

E.    Pegues

¶48    Finally, Avalon argues that Pegues's testimony—about Sprague's cause of death—was erroneously admitted. This issue was not preserved below. The record shows that Pegues testified at least two separate times—without objection—that Sprague's cause of death was the pressure ulcer and not one of the other ailments that Avalon argued could have been the cause of his death. Where Avalon has not preserved this issue or argued that an exception to preservation applies, we decline to address it further. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 ("When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation.").

CONCLUSION

¶49    The trial court properly denied Avalon's motion for directed verdict because Sprague sufficiently established the elements of its claim. We also conclude that the trial court did not abuse its discretion in admitting expert testimony challenged by Avalon. Affirmed.

_____